USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 96-2251 MARGARITA SERAPION, Plaintiff, Appellant, v. FRED H. MARTINEZ, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Salvador E. Casellas, U.S. District Judge] _________________________ Before Selya, Circuit Judge, Coffin and Cyr, Senior Circuit Judges. _________________________ Judith  Berkan,  with  whom  Mary Jo Mendez and Rosalinda Pesquera were on brief, for appellant. Graciela J. Belaval, with whom Alvaro R. Calderon, Jr. and Martinez, Odell & Calabria were on brief, for appellees. _________________________ July 18, 1997 _________________________ SELYA,  Circuit  Judge .   This appeal requires us to explore a gray area in the emerging jurisprudence of Title VII, 42 U.S.C. SS 2000e to 2000e-17 (1994). Having completed that task, we conclude  that  while  Title VII's employment-related shelter might in certain  circumstances extend to a person who is a partner in a law firm,  plaintiff-appellant Margarita Serapion, a partner in the now- disbanded law firm of Martinez, Odell, Calabria & Sierra (the Firm), is not entitled to such shelter here. Consequently, we affirm the lower court's entry of summary judgment in the defendants' favor. In explaining our rationale, we take a slightly unorthodox course. We begin with the facts, then shift to a discussion  of the statutory scheme, and then resume our historical account  by  describing  the course of the litigation. In succession, we thereafter rehearse the summary judgment standard, limn the doctrinal parameters of the requisite Title VII inquiry, address the merits, iron out a procedural wrinkle, and at long last conclude. I. THE FACTUAL PREDICATE Serapion  earned  a  distinguished reputation as a certified public accountant before deciding to switch careers. After graduating from the University of Puerto Rico Law School with honors in 1982, she joined the San Juan law firm of Colorado, Martinez, Odell, Calabria & Sierra as an associate. She left in 1983 for a stint in government service but returned in 1985. In the interim, Colorado had departed and the partnership had been 2 reconstituted. Approximately one year later, the appellant was mitted a non-proprietary"  partner ad into the Firm as a "junior" partner (sometimes termed  " ). While this status did not give her any equity position, it did give her some profit distribution units (PDUs) 1  and  enabled her to participate in meetings of the Board of Partners (a body which comprised all the partners, senior and junior in the aggregate, roughly half the Firm's lawyers and which had the ultimate responsibility for management and policymaking). In 1990, Serapion became what is variously described as a "senior" or "proprietary" partner. Theretofore the Firm's four name  partners  (all  males) were the only other proprietary partners. They  enjoyed  equality among themselves in respect to compensation, PDUs, benefits, and equity, and they promised Serapion that she would be elevated to an equal partnership in three years. In the meantime,  her  status  as  a proprietary partner brought about several changes in her working conditions: she received a 4% equity interest in the Firm (ceded 1% by each name partner); she assumed pro rata liability for the Firm's debts, losses, and other obligations; and she became a voting member of the Executive 1Each partner received an allotment of PDUs, and the Firm's profits  were  distributed  periodically to the partners in proportion to  the  number  of  PDUs  which each partner held. These distributions were over and above the recipients' base salaries. At all times material hereto, the name partners held 100 PDUs apiece. The junior partners held varying amounts, ranging from 20 to 45 PDUs apiece.  3 Committee  (a  five-member  group which was responsible for the Firm's day-to-day management). When the appellant became a proprietary partner, the Firm increased her allocation of PDUs to 75 units. Concomitantly , she began reaping a correspondingly larger share of the Firm's profits. Under the terms of the 1990 agreement, her allotment  of  PDUs  (and,  therefore, her share of the profits) was to continue  to  rise in increments until the end of 1992 when Serapion would achieve full parity with the four name partners. Despite these emoluments, Serapion was not on an equal footing  with  the name partners. Each of them had a greater equity interest (24% apiece) and a more munificent compensation package (roughly one-third higher than hers in 1990, although the gap gradually  closed). The difference in compensation was largely, if not entirely, a function of the disparate allocation of PDUs. Still, although her allotment of PDUs was less than that of the name partners, it was nonetheless significantly greater than that of even the most well-endowed junior partner. Serapion alleges that three of her partners (Fred H. Martinez, Lawrence Odell, and Jose Luis Calabria) never intended that a woman would achieve parity. These partners, she says, connived to prevent her from reaping the fruits of her bargain, eventually demanding that she sign an agreement which would have significantly diminished her authority within the Firm. When Serapion  stood her ground, the trio caused the Firm to dissolve in 1992 (shortly before the expiration of the three-year phase-in period) and simultaneously forged a new partnership called 4 "Martinez,  Odell & Calabria." The nascent firm included the three men,  as  well  as  most  of  the Firm's other lawyers. The founders did not invite either Serapion or Sierra (the remaining proprietary partner) to join. II. THE STATUTORY SCHEME We  pause  at  this juncture to sketch the legal landscape. Title VII is one of the brightest stars in the firmament of this nation's antidiscrimination laws. Generally speaking, it bars certain employment-related actions undertaken on the basis of impermissible criteria (such as gender). See, e.g., Smith v. F.W. Morse & Co., 76 F.3d 413, 420 (1st Cir. 1996). In relevant part, Title VII provides: It shall be an unlawful employment practice for an employer  (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. S 2000e-2(a)(1). The Firm is plainly an employer for Title VII purposes. After all, an employer is defined by statute as "a person engaged in an industry affecting commerce," and the statute makes clear that  "a  person" in this context can include a partnership. Id. at S 2000e(a)-(b). The rub is whether Serapion is an employee. Although the language we have quoted speaks of "any individual," courts long ago concluded that Title VII is directed at, and only protects, employees and potential employees. See, 5 e.g. ,  Vera-Lozano  v.  Inte rnational Broad., 50 F.3d 67, 69 (1st Cir. 1995); Broussard v. L. H. Bossier, Inc., 789 F.2d 1158, 1159 (5th Cir.  1986);  s ee generally Keyes v. Secretary of the Navy, 853 F.2d 1016,  1026  (1st  Cir.  1988) (noting that "Title VII does not presume to  obliterate all manner of inequity"). We know, moreover, that a single individual in a single occupational setting cannot be both an  employer  and an employee for purposes of Title VII. See, e.g., Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 80-81 (8th Cir. 1996), cert. denied, 117 S. Ct. 1694 (1997); EEOC v. Dowd & Dowd,  Ltd.,  736  F.2d  1177, 1178 (7th Cir. 1984); Johnson v. Cooper, Deans & Cargill, 884 F. Supp. 43, 44 (D.N.H. 1994). Even so, the parameters of the term "employee" have proven elusive. Title VII defines an employee only as "an individual employed by an employer,"  42 U.S.C. S 2000e(f), a turn of phrase which chases its own tail. See Broussard, 789 F.2d at 1160; see also Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992) (terming nearly identical language in the ERISA statute, 29 U.S.C. S 1002(6), "completely circular"). Given  the  unhelpful  nature of the supplied definition, we are compelled to look for assistance in other federal antidiscrimination statutes that contain similar definitions of "employee," such as the Age Discrimination in Employment Act (ADEA), 29 U.S.C. SS 621-634 (1994), the Employee Retirement and Income  Security  Act  (ERISA), 29 U.S.C. SS 1001-1461 (1994), and the Fair Labor Standards Act (FLSA), 29 U.S.C. SS 201-219 (1994). We regard Title VII, ADEA, ERISA, and FLSA as standing in pari passu 6 and endorse the practice of treating judicial precedents interpreting  one  such  statute as instructive in decisions involving another.   See , e.g., Oscar Mayer & Co. v. Evans, 441 U.S. 750, 756 (1979); Lorillard v. Pons, 434 U.S. 575, 584 (1978); Wheeler v. Hurdman, 825 F.2d 257, 263 (10th Cir. 1987); Hyland v. New Haven Radiology Assocs., 794 F.2d 793, 796 (2d Cir. 1986). Of course, we are not remitted solely to statutory parallels. There is a developing jurisprudence under Title VII. In it, we detect precedential value not only in cases which actually involve partnerships, but also in decisions which have determined the status of individuals by analogy to a partnership paradigm (even though the individuals involved were principals of entities  other than partnerships). See, e.g., Devine, 100 F.3d at 80-81; Fountain v. Metcalf, Zima & Co., 925 F.2d 1398, 1399-1401 (11th Cir. 1991). We do not, however, hitch our wagon to cases deciding  whether a particular individual is an employee as opposed to an independent contractor. That distinction is between those who are part of an employer's business and those who are running their own businesses, and the factors central to that inquiry are inapposite here. See Wheeler, 825 F.2d at 271-72. There are also a few cases which deal directly with whether  a  partner in a professional practice should be regarded as an  employee  for the purpose of Title VII (and, therefore, entitled to its safeguards). The seminal case is Burke v. Friedman, 556 F.2d 867, 869-70 (7th Cir. 1977), in which the court held that partners in an accounting firm were not employees vis-a-vis Title 7 VII. This interpretation received a modicum of support in Hishon v.  King  &  Spalding, 467 U.S. 69 (1984). Although the Hishon Court answered  a  different question holding that Title VII precluded a law  firm  from denying partnership consideration to an associate on the basis of her gender, see id. at 76-78 Justice Powell cautioned that the majority opinion did "not require that the relationship among partners be characterized as an `employment' relationship to which Title VII would apply." Id. at 79 (Powell, J., concurring). Since Hishon, several appellate courts have followed  Justice Powell's lead and declared, with varying nuances, that partners are not protected as employees under federal antidiscrimination laws. See Simpson v. Ernst & Young, 100 F.3d 436, 443 (6th Cir. 1996), cert. denied, 117 S. Ct. 1862 (1997); Wheeler, 825 F.2d at 263; accord EEOC Decision No. 85-4, 2 Empl. Prac. Guide (CCH) q 6846, at 7040-41 & n.4 (1985). As we visualize it, the key inquiry is into the attributes of the relationship between the partnership and those whom  it  styles  as  partners. The method by which this inquiry is to be conducted how a court determines whether an individual labelled  as  a partner is to be treated as an employee for purposes of Title VII is an unresolved issue which lies at the epicenter of this appeal. III. THE LITIGATION When  her  three  former  partners folded the Firm and dashed her expectations of proprietary parity, Serapion sued them and their new firm (Martinez, Odell & Calabria) in Puerto Rico's 8 federal district court. She charged in her complaint that the defendants had violated both Title VII and local law. After the defendants'  early  attempt to obtain summary judgment misfired,2 the parties  engaged in pretrial discovery. Thereafter, the defendants renewed their quest for brevis disposition. Their new motion relied on alternative grounds. It averred that Serapion, as a partner in the Firm, was not an employee (and, therefore, had no recourse to Title VII). It also averred that Serapion had not adduced  any  competent  proof that gender-based discrimination caused the  Firm's  disintegration (an event which the defendants attributed to irreconcilable differences between two warring factions of proprietary partners). Judge Casellas granted the defendants' motion, holding that Serapion was not an employee as that term had been developed in federal jurisprudence and that she was thus ineligible for the prophylaxis of Title VII. See Serapion v. Martinez, 942 F. Supp. 80, 84-85 (D.P.R. 1996). The court held alternatively that Serapion had failed to make out a prima facie case of discrimination under Title VII. See id. at 85-87. Finally, the court refused to exercise supplemental jurisdiction over the pendent claim and dismissed that claim without prejudice to its pursuit in the courts of Puerto Rico. See id. at 88-89. This appeal followed. 2When the defendants filed their initial motion for summary judgment,  Chief Judge Cerezo denied it. The case was subsequently transferred  to  Judge  Casellas' calendar as part of a redistribution of cases ancillary to his assumption of judicial office. 9 IV. THE SUMMARY JUDGMENT STANDARD While the origins of the summary judgment standard may have been important in the distant past, modern federal practice has reached a point at which the standard has achieved aphoristic acceptance, rendering the attribution of specific authorship superfluous. We thus present the standard without particularized citation,  referring  readers interested in further exposition to the long litany of decisions that have placed a gloss on the language of Fed. R. Civ. P. 56(c). See McCarthy v. Northwest Airlines, Inc. ,  56  F.3d  313,  315  (1st Cir. 1995) (collecting cases); Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995) (same). Summary judgment is a means of determining whether a trial is actually required. It is appropriately granted when the record  shows  that  no  genuine issue of material fact exists and that the  moving  party  is  entitled to judgment as a matter of law. Thus, in  order  to  defeat a properly crafted summary judgment motion, the party opposing it must demonstrate that a trialworthy issue looms as to a fact which could potentially affect the outcome of the suit. A trial or appellate court considering the merits of a summary judgment initiative must peruse the record in the light most favorable to the nonmovant. While this equation must take into account all properly documented facts, the court may ignore unsupported conclusions, rank speculation, and opprobrious epithets. If the evidence, so viewed, reveals a genuine dispute over a material fact that is, if a reasonable factfinder, 10 examining  the  evidence  and drawing all reasonable inferences in the required manner, could resolve a factual controversy which is critical  to  the  outcome  of the case in favor of the nonmoving party then summary judgment will not lie. Where, as here, the district court enters summary judgment, we review its ruling de novo. V. THE DOCTRINAL PARAMETERS Putting this appeal into proper perspective requires us to  articulate  the  doctrinal parameters which inform an inquiry into a partner's status vis-a-vis Title VII. We divide our discussion into two segments. A. Partnerships  are  mutable  structures, and partners come in varying shapes and sizes. Consequently, attempting to delineate the  circumstances in which a particular partner should be regarded as  an  employee  for  Title  VII purposes is tricky business. Although one court has hinted at the desirability of a per se rule, saying in effect that all members of professional services corporations were  employees for purposes of the antidiscrimination laws (there, the  ADEA),  no  matter  how  significant a role they played in managing the  affairs  of  the  corporation, see Hyland, 794 F.2d at 797-98,3 we reject the notion that labels can conclusively resolve status inquiries. We hold instead that the Title VII question cannot be 3We note that the Second Circuit appears to have retreated somewhat  from  this  position. See EEOC v. Johnson & Higgins, Inc., 91  F.3d  1529, 1538-39 (2d Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3755 (U.S. May 1, 1997) (No. 96-1743). 11 decided  solely on the basis that a partnership calls or declines to call a person a partner. A court must peer beneath the label and probe the actual circumstances of the person's relationship  with the partnership. See Devine, 100 F.3d at 80-81; Fountain ,  925 F.2d at 1400-01; see also Hishon, 467 U.S. at 79 n.2 (Powell,  J.,  concurring)  ("Of course, an employer may not evade the strictures of Title VII simply by labelling its employees as `partners.'"); see generally Board of Trade v. Hammond Elevator Co. ,  198  U.S. 424, 437-38 (1905) (holding that the manner in which the parties to an agreement designate their relationship is not controlling). In other words, partnerships cannot exclude individuals  from  the  protection of Title VII simply by draping them in grandiose titles which convey little or no substance. In our judgment, the correct course is to undertake a case-by-case analysis aimed at determining whether an individual described  as  a  partner  actually bears a close enough resemblance to an employee to be afforded the protections of Title VII. See Strother  v.  S outhern Cal. Permanente Med. Group, 79 F.3d 859, 867- 68 (9th Cir. 1996) (reversing grant of summary judgment where the trial  court  based its status determination principally on the fact that  the  plaintiff  was  called a partner); see also Devine, 100 F.3d at 81 (holding, in a case involving a professional services corporation,  that a court should not treat either the individual's title  or  the  entity  form  as determinative). After all, form should not be permitted to triumph over substance when important civil rights are at stake. 12 We also reject a variation on the per se theme advanced by the appellant. She asseverates that, due to the peculiarities of Puerto Rico's civil law structure, all partners in all Puerto Rico partnerships must be considered employees for purposes of Title  VII.   In a civil law system, this theory goes, a partnership is not merely a banding together of individual partners but a separate  entity  which  must itself be considered the employer of all the individual partners. We need not delve too deeply into the hotly disputed question  of  whether the appellant's construct is sound as a matter of Puerto Rico law. It is enough for our purposes that the construct is unsound as a matter of federal law. The appellant cites no apposite authority for the novel proposition that the status of an individual under Title VII should vary depending on the  law  of  the state in which a partnership entity is chartered or in which a claim arises. We think that the reverse is true: whether an individual is an employee for purposes of Title VII is a matter of federal law, and the question must be answered with reference  to  principles  of federal law. Accord Broussard, 789 F.2d at  1159-60;  C obb v. Sun Papers, Inc., 673 F.2d 337, 339 (11th Cir. 1982); Lambertsen v. Utah Dep't of Corrections, 922 F. Supp. 533, 536 (D. Utah 1995), aff'd, 79 F.3d 1024 (10th Cir. 1996).4 This determination  is  grounded in both Supreme Court case law and strong federal policies of uniformity and fairness.     4 The  Bro ussard decision is of particular interest because the claim which was considered there arose in Louisiana a jurisdiction which, like Puerto Rico, has a civil law tradition. 13 In  Robinson  v Shell Oil Co., 117 S. Ct. 843 (1997), the Court decided that the word "employee," as used in the antiretaliation section of Title VII, 42 U.S.C. S 2000e-3(a), included  former as well as current employees. See id. at 849. In this issue, the Court ignored state law, concentratin .  resolving g instead on the statute itself and on federal jurisprudence. See id. at 846-48. The Court took a similar approach in Walters v. Metropolitan Educ. Enters., Inc., 117 S. Ct. 660, 663-66 (1997), resolving the scope of the words "employee" and "employer" under Title VII by reference solely to federal statutes and judicial opinions.   So, too, in Darden, 503 U.S. at 322-23 & n.3, the Court determined the meaning of "employee" under ERISA through the application of established common law principles (rejecting the idea that the term incorporated the law of any particular state). These cases are merely specific applications of the widely  accepted principle that, in the absence of plain indication of a contrary intent, courts ought to presume that the interpretation of a federal statute is not dependent upon state law. 5   See ,  e.g. ,  Mississ ippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 43 (1989); Dickerson v. New Banner Inst., Inc., 460 U.S.  103,  119  (1983);  Uni ted States v. De Luca, 17 F.3d 6, 8-9 (1st Cir. 1994).     5 We  are  unimpressed by the appellant's attempted analogy to a line of cases involving the federal tax laws. See, e.g., Morgan v.  Commission er, 309 U.S. 78 (1940). The appellant has not called to our attention any court which has accepted those cases as persuasive in the Title VII context, and we decline to be the first. 14 Our  refusal  to give state law controlling weight on this question  not  only comports with the case law but also makes common sense. Linking status determinations to local law would make an important federal statute mean different things in different states. This sort of checkerboarding would undermine Congress' easily  discerned intent that Title VII stand as a national code of conduct in the struggle to ensure equality of treatment in the workplace. See 110 Cong. Rec. 13,088-13,091 (1964). Moreover, since  the  United  States  is home to in excess of 1,000,000 operating partnerships, numbering over 13,000,000 individual partners, see U.S. Bureau of the Census, Statistical Abstract of the United States 535 (116th ed. 1996), relegating status determinations to local law would create enormous confusion and widespread uncertainty. In regard to Title VII, there is no basis for departing from the precept that "federal statutes are generally intended to have  uniform  nationwide application," Mississippi Band of Choctaw Indians ,  490  U.S. at 43, and there is every reason for adhering to it. Here, moreover, the possibility that defining the term "employee"  by reference to local law would open the door for state legislatures to adopt restrictive definitions and thereby defeat Title  VII's  broad remedial purposes militates strongly in favor of a uniform national standard. Cf. United States v. Kimbell Foods, Inc. ,  440  U.S. 715, 728 (1979) (suggesting that, in cases in which the application of state law would frustrate the specific objectives  of  a  federal  program, establishing uniform federal rules 15 is appropriate). Thus, we hold that the meaning of the term "employee," as that term is used in Title VII, must be derived through an analysis of federal statutes, legislative history, judicial  decisions, and common law understandings, not through the law of Puerto Rico. B. Having  determined that federal law controls the question of the appellant's status, we turn next to an analysis of those attributes  of  a  partner's relationship to the partnership which may influence the decisional calculus. In this endeavor, we do not write on a pristine page. Two other courts of appeals have tried their  hands  at plotting the line which divides partners who may be treated  as  employees  under federal antidiscrimination statutes from those who may not. In Simpson, the Sixth Circuit considered the status for ADEA purposes of an individual denominated a partner by an international accounting firm. In attempting to ascertain whether the plaintiff, notwithstanding his title, qualified as a person protected by the ADEA, the court weighed factors such as: the right and duty to participate in management; the right and duty to act as an agent of other partners; exposure to liability; the fiduciary relationship among partners . . . participation in profits and losses; investment in the firm; partial ownership of firm assets; voting rights; the aggrieved individual's ability to control and operate the business; the extent to which the aggrieved individual's compensation was calculated as a percentage of the firm's profits; the extent of that individual's employment  security; and other similar indicia of ownership. 16 Simpson, 100 F.3d at 443-44. Concluding that the plaintiff more closely resembled an employee than a proprietor the court noted particularly  that the plaintiff had no right either to participate in  the  partnership's management decisions or to vote for those who did, and that his compensation was not determined on the basis of the firm's profits the court allowed the plaintiff to sue under the ADEA. See id. at 441-43. The Tenth Circuit grappled with the same sort of conundrum in Wheeler, a case which also involved a partner in an accounting firm. In determining that the plaintiff was not an employee  for  purposes of either Title VII or the ADEA, the Wheeler court  focused on her participation in firm profits and losses, her exposure to liability, her investment in the firm, and her voting rights under the partnership agreement. See Wheeler, 825 F.2d at 276. Other cases, though not involving partnerships, are useful in our analysis. In Devine, for example, the Eighth Circuit, in deciding whether attorneys who were shareholders and directors  in  a  professional services corporation were employees for Title VII purposes, stated that courts should "look to the extent to  which  [the  attorneys]  manage and own the business." Devine, 100 F.3d at 81. The court proceeded to consider factors such as the attorneys' ability to participate in setting firm policy, the extent  of  their contributions to firm capital, their liability for firm debts, and the correlation (or lack of correlation) between their compensation and the firm's profits. See id. 17 In  a  comparable  situation, the Eleventh Circuit evaluated the ADEA claim of a member-shareholder of an accounting firm by weighing  elements such as the plaintiff's ability to share in firm profits and whether his compensation was a function of those profits; the plaintiff's liability for the firm's losses, debts, and  obligations;  and  the  extent of the plaintiff's right to vote on major firm decisions. See Fountain, 925 F.2d at 1401. The court dismissed  an  assertion that the "autocratic" actions of the firm's president constituted a reasonable basis for concluding that the plaintiff  was an employee. "Domination by an `autocratic' partner over  others  is  not  uncommon and does not support a finding that the others are `employees.'" Id. We think that these cases provide valuable guidance concerning  the factors which courts must consider in making status determination s under Title VII. In large, the critical attributes of  proprietary status involve three broad, overlapping categories: ownership,  remuneration, and management. Within these categories, emphasis will vary depending on the circumstances of particular cases. Nonetheless, although myriad factors may influence a court's ultimate decision in a given case, we recount a non- exclusive list of factors that frequently will bear upon such determinations. Under the first category, relevant factors include investment  in  the  firm,  ownership of firm assets, and liability for firm debts and obligations. To the extent that these factors exist,  they  indicate  a  proprietary role; to the extent that they do 18 not  exist,  they  indicate  a status more akin to that of an employee. Under the second category, the most relevant factor is whether (and if so, to what extent) the individual's compensation is based on the firm's profits. To the extent that a partner's remuneration is subject to the vagaries of the firm's economic fortunes, her status more closely resembles that of a proprietor; conversely, to the extent that a partner is paid on a straight salary  basis,  the  argument for treating her as an ordinary employee will gain strength. A second potentially relevant factor in this regard relates to fringe benefits. An individual who receives benefits of a kind or in an amount markedly more generous than similarly situated employees who possess no ownership interest is more likely to be a proprietor. Under the third category, relevant factors include the right  to  engage  in  policymaking; participation in, and voting power with  regard  to, firm governance; the ability to assign work and to direct  the  activities  of  employees within the firm; and the ability to  act  for  the firm and its principals. Once again, to the extent that these factors exist, they indicate a proprietary role. We add a note of caution. Status determinations are necessarily made along a continuum. The cases that lie at the polar extremes will prove easy to resolve. The close cases, however, will require a concerned court to make a case-specific assessment of whether a particular situation is nearer to one end of the continuum or the other. In performing this assessment, no single  factor should be accorded talismanic significance. Rather, 19 a status determination under Title VII must be founded on the Given  these  verities, any effort to formulate a hard-and-fast rule would likely result in a statement that was overly simplistic, or too general to be of any real help, or both.  VI. THE MERITS To complete our journey, we must undertake a particularized totality of the circumstances which pertain in a particular case. analysis aimed at determining whether the lower court,  at  the summary judgment stage, appropriately could conclude that  Serapion  was  not  an  employee of the Firm within the purview of Title  VII.   Consistent  with the summary judgment protocol, we focus only on uncontested documentary proof, such as the provisions of the partnership agreement and the minutes of the Firm's Executive Committee meetings (every page of which bears the appellant's initials), supplemented by facts asserted by the appellant and those conceded by her. The factors relevant to ownership and remuneration provide powerful indications that the appellant should not be treated as an employee for Title VII purposes. It is undisputed that Serapion received an equity interest in the Firm upon being named a proprietary partner. Her compensation was predicated in substantial  measure  on  the Firm's profits,6 and she would have been 6Whereas associates in the Firm received fixed compensation (plus an occasional bonus based on performance), all partners (senior  and  junior) received a base salary supplemented by a share of the Firm's profits paid out periodically in proportion to each partner's  allotment  of  PDUs. For example, when the appellant first ascended to proprietary partnership, her overall compensation was composed of a base salary ($60,183 per annum) plus a share of the 20 liable had the Firm sustained losses. In the ensuing months, she made substantial capital contributions to the Firm. She als received very generous fringe benefits, e.g., a car allowance in excess of $10,000 per annum and a discretionary expense allowance of $16,400 yearly. These benefits were comparable to those received by the other proprietary partners, but more extravagant than the benefits available to junior partners and associates. The picture is only slightly less clear as to the e o management prong of the test. As a proprietary partner, th appellant participated meaningfully in the Firm's governance. Unlike non-proprietary partners (who were allowed to attend Board of Partners' meetings but could vote only on matters affecting their own interests), proprietary partners were guaranteed a vote in  all  matters  brought  before the Board. The partnership agreement describes  this tribunal as "the highest policy and decision making body of the Firm." Furthermore, the appellant's vote had added significance: if an impasse developed between a majority of the Board and 4/5ths of the proprietary partners, the decision of the proprietary partners controlled. While the appellant belittles Board membership, voting status in a law firm's highest decisionmaking body is no small thing. The fact that the firm's  profits  (amounting to approximately $30,000 during her first year  as  a  proprietary partner). Her total compensation was pegged to  75%  of  what the four name partners received (resulting in gross remuneration appreciably higher than that earned by any non- proprietary  partner).   Her percentage allocation increased steadily during the period that followed, so that, at the time the Firm dissolved  in  1992,  her  total compensation equalled 92% of the total compensation paid to each of the name partners. 21 membership consisted of roughly half the lawyers in the Firm dilutes,  but  does  not  dispel, the significance of such membership.7 Serapion's involvement in management went well beyond membership in the Board of Partners. She served as one of five voting  members  of  the  Executive Committee, which managed the Firm's day-to-day operations and regularly decided matters relating to salaries, finances, fee schedules, office space, employee performance,  recruitment, admission of new partners, acceptance of business,  work  assignments, and the staffing of cases. In a period of  about  two  years,  the  appellant attended no fewer than sixteen of these meetings and wrote up the minutes. A review of Serapion's handiwork  shows her to have been a robust participant in important policy decisions; for example, the minutes reflect that she made several  motions  anent  the admission of new partners. The Executive Committee was the nerve center of the Firm. The appellant's membership on it, coupled with her degree of involvement in management generally, strongly suggests that she was not an employee.   So, too, does the fact that she had authority to act as an agent for the Firm and its partners; one manifestation of this authority was that, after she became a senior partner, the Firm empowered her to sign checks drawn on its accounts. The appellant does not go gently into this dark night. For  the  most  part,  she  strives to refocus our attention on the ways     7 We  take judicial notice of the fact that many law firms have partner/associate ratios near one-to-one, yet few lawyers working for these firms would deny that the partners enjoy a status fundamentally different from that of the associates. 22 in  which  she  possessed  less power than the four name partners. She complains that her name was never added to the Firm's name; that neither  her  compensation  nor her equity interest ever equalled that of  the  name  partners;  that she had less authority to assign matters within the Firm; and that she did not head any of the Firm's departments.   But  this  constellation of complaints assumes that all partners except those equivalent in stature and authority to the most powerful partners of a law firm are employees for Title VII purposes. The assumption lacks any solid legal underpinning. A person with the requisite attributes of proprietary status is properly considered a proprietor, not an employee, regardless of the fact that others in the firm may wield more power. See Fountain, 925 F.2d at 1401. The appellant also makes a closely related argument, noting  that  she  rarely  got her way on disputed matters and that she dissented  from many decisions.8 But focusing on the fact that her views sometimes did not prevail confuses participation with control.   Insofar  as  the  management prong of the test is concerned, the  hallmarks  of  proprietary status are the right to participate in decisionmaking and the right to have a meaningful say in governance. Within the structure of any organization, certain 8It is disingenuous for the appellant to focus on the number of  recorded  votes taken by the Executive Committee as proof of her alleged powerlessness, especially since the minutes of those meetings indicate that the vast majority of policy decisions were reached by consensus. General agreement on a matter is certainly tantamount to a vote, and it cannot be gainsaid that numerous policy  decisions were made, often by unanimous consent, during the time the appellant was a member of the Executive Committee. 23 individuals  tend  to  dominate others, and the dominators' viewpoints will  more  often be adopted. See id. This phenomenon often occurs among equals (Adams reportedly wrote to Jefferson on November 12, 1813,  describing Dickinson as "primus inter pares, the bellwether, the leader of the aristocratical flock") and, in all events, the exercise  of  hegemony  by  one partner does not automatically dislodge others  in  the  hierarchy  from proprietary status. Elsewise, all the partners in a law firm or an accounting practice, save only the managing partner(s), would be treated as employees for Title VII purposes regardless of the extent of their ownership or the correlation between their remuneration and the entity's profits. The law is to the contrary: it is not a necessary corollary of proprietary status that the views of the partner in question will always or even usually prevail. In this case, all roads lead to Rome. The evidence is uncontradicte d that the appellant had an ownership interest in the Firm; that her compensation depended substantially on the Firm's fortunes; and that she enjoyed significant voting rights in the Firm's two principal governing bodies. Given these undisputed facts, no reasonable factfinder could conclude that Margarita Serapion was other than a bona fide equity partner, and, as such, a person ineligible to claim the protection which Title VII reserves for those who are employees. Consequently, the district court did not err in granting summary judgment in the defendants' 24 favor on the Title VII claim.9 VII. THE IDENTITY OF THE DEFENDANTS Before closing, we note a procedural anomaly. For reasons best known to her, the appellant elected to sue three of her former partners and their fledgling partnership, but not the Firm. This tactic raises questions about whether the new partnership can be held liable as a successor to the Firm and whether  law  partners  can  be held individually liable as "employers" under  Title  VII. The last question, in particular, is potentially difficult. Compare Tomka v. Seiler Corp., 66 F.3d 1295, 1314-17 (2d  Cir.  1995) (dismissing the possibility of individual liability under Title VII) with Kauffman v. Allied Signal, Inc., 970 F.2d 178, 184-85 (6th Cir. 1992) (suggesting that individual liability exists). This circuit has not resolved the issue. See Scarfo v. Cabletron  Sys., Inc., 54 F.3d 931, 951-52 (1st Cir. 1995) (leaving the question open). We need not enter this thicket today. It is crystal clear  that  the liability (if any) of the individual defendants and the new partnership cannot possibly exceed that of the actual employer. Because Serapion was not an employee, her suit cannot proceed  under  Title  VII  against any of the individual defendants or against the new partnership. 9Because this ground is dispositive of the federal claim, we take no view of the district court's alternative holding that Serapion failed to make out a prima facie case of gender-based discrimination. 25 VIII. CONCLUSION We need go no further. Once it had determined that the federal claim could not go forward, the district court had substantial discretion under 28 U.S.C. S 1367(c)(3) (1994) either to  retain  or  to  relinquish jurisdiction over the supplemental claim which the appellant had brought under local law. See, e.g., McIntosh  v.  Antonino ,  71  F.3d 29, 33 n.3 (1st Cir. 1995); Rodriguez v.  Doral  Mortgage  Corp.,  57 F.3d 1168, 1176-77 (1st Cir. 1995). In this instance, the court's decision to refrain from exercising jurisdiction was well within the encincture of its discretion. Affirmed. 26