Fecteau, Francis R., J.
INTRODUCTION
The plaintiff, Dr. Tina Theroux (“Dr. Theroux”), brought this action against the defendants, Stephen Singer, D.D.S., P.C., Dr. Stephen Singer (“Dr. Singer”) and Dr. Todd Harris (“Dr. Harris”) seeking damages for discrimination, i.e., gender and/or pregnancy, in violation of the Massachusetts Equal Rights Act and for breach of contract. The matter is before the court on the defendants’ motion to dismiss, or in the alternative, motion for summary judgment.[2], [3] For the following reasons, the defendants’ motion is ALLOWED IN PART and DENIED IN PART.
BACKGROUND
Stephen Singer, D.D.S., P.C. d/b/aBlackstone Valley Dental Associates (“BVDA”) is a dental practice group incorporated in Massachusetts. Dr. Theroux, a dentist, began working as an employee of BVDA in 2001. At the time Dr. Theroux was hired, Dr. Singer and Dr. Harris were dentists at BVDA and were the sole shareholders of the company. Dr. Singer held 75% of the shares and Dr. Harris held the remaining 25%.
In or about July of 2001, Dr. Theroux entered into lengthy negotiations with Dr. Singer and Dr. Harris to *188 purchase 25% of Dr. Singer’s shares in BVDA. During the contract negotiations, Dr. Singer and representatives of the defendants asked the plaintiff if she intended to have more children and requested that provisions be included in the proposed stock purchase agreement that penalized her if she became pregnant. Upon being informed that such provisions would likely be illegal, the defendants agreed to withdraw their request for a “pregnancy contingency” clause.
On or about March 8, 2002, Dr. Theroux entered into a Purchase and Sale Agreement of Stock with Dr. Singer whereby Dr. Theroux purchased 25% of BVDA’s shares from Dr. Singer (the “Stock Purchase Agreement”). Thereafter, Dr. Singer, Dr. Harris, and Dr. Theroux owned 50%, 25% and 25% of BVDA’s shares, respectively.
A number of agreements that were ancillary and necessary to the implementation of the purchase were signed contemporaneously with the Stock Purchase Agreement including, but not limited to, a Shareholder Agreement, a Stock Redemption Agreement, Indemnification Agreements, and Employment Agreements. At the center of the controversy between the parties is a “deemed withdrawal” provision of the Stock Redemption Agreement, which states that “in the event of withdrawal of Dr. Singer occurring prior to January 1, 2004, Dr. Singer shall not be required to sell his stock to [BVDA] as his withdrawal shall constitute a deemed withdrawal by Dr. Theroux and accordingly the provisions of Dr. Theroux’s withdrawal shall apply” (the “Deemed Withdrawal Provision”). The contract further states that “if either party withdraws during the first five years of the Agreement, Dr. Singer will be entitled to keep the practice location, practice patients, and equipment.” In accordance with these provisions, Dr. Singer was free to nullify the Stock Purchase Agreement for any reason prior to January 1, 2004.
During Dr. Theroux’s tenure with BVDA, she noticed that Dr. Singer, Dr. Harris and other management personnel displayed annoyance towards female BVDA employees taking maternity leave. Dr. Singer “jokingly” offered to pay for birth control for any member of the staff. In addition, at a staff meeting in November of 2003, Dr. Singer presented handouts to the BVDA employees identifying a claimed decrease in the productivity of female staff members who had had children. These handouts compared the number of prime hours pregnant staff members worked prior to having children with the number of hours they worked thereafter. BVDA also revised its manual to specifically state that any employee taking maternity leave would not be guaranteed the same benefits as those staff members who did not.
On or about October 27, 2003, Dr. Theroux informed the defendants that she was pregnant and intended to take a three-week leave of absence after the birth of her child the following year. On or about December 20, 2003, Dr. Singer notified Dr. Theroux that he was invoking the Deemed Withdrawal Provision, effective December 31, 2003, thereby forcing Dr. Theroux out as a shareholder of BVDA. Despite Dr. Theroux’s requests, Dr. Singer refused to provide her with an explanation for his actions. During the entire time Dr. Theroux was with BDVA, the defendants never raised any issues regarding her quality of work or performance.
DISCUSSION
I. Standard of Review
When evaluating the sufficiency of a complaint pursuant to a motion to dismiss, the court must accept as true the allegations of the complaint, as well as any reasonable inferences to be drawn from them in the plaintiffs favor. Fairneny v. Savogran Co., 422 Mass. 469, 470 (1996). “[The] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Although errors of law based on the facts alleged will not surmount a motion to dismiss, the picón tiffs burden is “relatively light.” Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998), citing Gibbs Ford, Inc. v. United Track Leasing Corp., 399 Mass. 8, 13 (1987).
II. General Laws Chapter 15IB
Dr. Theroux claims that the defendants violated the Massachusetts Equal Rights Act, G.L.c. 93, §102, (“MERA”) by unlawfully discriminating against her on the basis of her pregnancy. The defendants argue that Dr. Theroux’s MERA claim should be dismissed because G.L.c. 151B provides the exclusive remedy for claims of alleged employment discrimination in Massachusetts and, therefore, MERA is inapplicable to the case at hand. Under G.L.c. 151B, §4(1):
It shall be unlawful practice . . . [f]or an employer, by himself or his agent, because of race, color, religious creed, national origin, sex, sexual orientation ... or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or terms, conditions, or privileges of employment, unless based upon a bona fide occupational qualification.
Discrimination on the basis of pregnancy and/or upcoming maternity leave is a form of gender discrimination prohibited by G.L.c. 151B, §4. Mass. Elec. Co. v. MCAD, 375 Mass. 160, 167-69 (1978).
Claims of discrimination prohibited by G.L.c. 151B, §4 must be filed with the Massachusetts Commission Against Discrimination (“MCAD”) within 300 days of the alleged act of discrimination.[4] G.L.c. 151B, §5.[5] Filing a complaint with MCAD is the exclusive remedy for claims of alleged discrimination in Massachusetts and “[r]esort to the courts is not available for a com *189 plaint of discrimination within the jurisdiction of the MCAD unless the person claiming to have been the object of unlawful discrimination first makes a timely complaint to that agency.” Cherella v. Phoenix Technologies, Ltd., 32 Mass.App.Ct. 919 (1992), citing Melley v. Gillete Corp., 19 Mass.App.Ct. 511, 512-13 (1985); See also G.L.c. 151B, §9 (“[A]s to acts declared unlawful by section 4, the administrative procedure provided in this chapter under section 5 shall, while pending, be exclusive”).[6] It is well established that where c. 15 IB applies, its comprehensive remedial scheme is exclusive and a plaintiff alleging employment discrimination cannot pursue a remedy under MERA. Green v. Wyman-Gordon Co., 422 Mass. 551, 557-58 (1996); Agin v. Federal White Cement, Inc., 417 Mass. 669, 672 (1994).
Dr. Theroux did not file a complaint with MCAD within the 300-day filing period provided by c. 151B. She asserts, however, that she was not required to comply with c. 15IB’s administrative procedures because, as a principal of a professional corporation, she was an employer, not an employee, and her discrimination claim is outside the scope of the statute. The defendants argue that by signing a written employment agreement, Dr. Theroux defined herself as an employee of BVDA through free exercise of contract and she is, therefore, subject to the requirements of c. 151B.
Massachusetts courts have not addressed the issue of whether a partner or a director-shareholder in a professional corporation is an employer or an employee for the purposes of c. 15 IB. There are, however, several federal decisions discussing the issue as it relates to federal antidiscrimination laws.[7] In Serapion v. Martinez, 119 F.3d 982 (1st Cir. 1997), the First Circuit Court of Appeals was asked to determine whether an equity partner in a law firm was an “employee" for the purposes of bringing an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. §2000 et seq. (‘Title VH”).[8] In determining that the partner was not an “employee” that could bring a Title VII claim, the First Circuit set forth three “broad, overlapping categories” which courts must consider when making status determinations under Title VII: ownership, remuneration, and management. For each category, the court set forth several factors to be considered:
Under the [ownership] category, relevant factors include investment in the firm, ownership of firm assets, and liability for firm debts and obligations. To the extent that these factors exist, they indicate a proprietary role; to the extent that they do not exist, they indicate a status more akin to that of an employee.
Under the [remuneration] category, the most relevant factor is whether (and if so, to what extent) the individual’s compensation is based on the firm’s profits. To the extent that a partner’s remuneration is subject to the vagaries of the firm’s economic fortunes, her status more closely resembles that of a proprietor; conversely, to the extent that a partner is paid on a straight salary basis, the argument for treating her as an ordinary employee will gain strength. A second potentially relevant factor in this regard relates to fringe benefits. An individual who receives benefits of a kind or in an amount markedly more generous than similarly situated employees who possess no ownership interest is more likely to be a proprietor.
Under the [management] category, relevant factors include the right to engage in policymaking; participation in, and voting power with regard to, firm governance; the ability to assign work and to direct the activities of employees within the firm; and the ability to act for the firm and its principals. Once again, to the extent that these factors exist, they indicate a proprietary role.
Id. at 990.[9] The court found no one factor to be dispositive, holding that a status determination under Title VII “must be founded on the totality of the circumstances which pertain in a particular case.” Id.[10] The court further rejected “the notion that labels can conclusively resolve status inquiries” finding that a court “must peer beneath the label and probe the actual circumstance of the relationship.” Id. at 987 citing Board of Trade v. Hammond Elevator Co., 198 U.S. 424, 437-38 (1905) (holding that manner in which parties to an agreement designate their relationship is not controlling).
In 2003, in Clackamus Gastroenterology Assoc., P.C v. Wells, 538 U.S. 440 (2003), the United States Supreme Court addressed the issue of whether a principal in a professional corporation is an employee for the purposes of the Americans with Disabilities Act (the “ADA”).[11] The court found that “the common-law element of control” was the “principal guidepost” to be followed in making such a status determination. Id. at 448. In support of this conclusion, the court looked to guidelines set forth by the Equal Employment Opportunity Commission (the “EEOC”) which list specific factors to be considered when determining whether a partner, officer or majority shareholder qualifies as an employee for purposes of federal antidiscrimination law. Id. at 448-49 citing 2 Equal Employment Opportunity Commission, Compliance Manual §§605.0008-605.00010 (2000) (the “EEOC Compliance Manual”).[12] Under the EEOC guidelines, an individual’s status turns on “whether the individual acts independently and participates in managing the organization, or whether the individual is subject to the organization’s control.” EEOC Compliance Manual, §605.0009. The EEOC Compliance Manual sets forth six factors relevant to this inquiry:
Whether the organization can hire or fire the individual or set the rules and regulations of the individual’s work
*190 Whether and, if so, to what extent, the organization supervises the individual’s work
Whether the individual reports to someone higher in the organization
Whether and, if so, to what extent the individual is able to influence the organization
Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts
Whether the individual shares in the profits, losses and liabilities of the organization.
EEOC Compliance Manual, §605.0009. The court held that all six factors were “relevant to the inquiry whether a shareholder-director is an employee” but noted that this list is not “exhaustive” and that “[t]he answer to whether a shareholder-director is an employee or employer cannot be decided in every case by a shorthand formula or magic phrase.” Clackamus, 538 U.S. at 449-50, n.10, quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 324 (1992). The court further held that “the mere existence of a document styled "employment agreement" [should not] lead inexorably to the conclusion that either party is an employee," rather “the answer to whether a shareholder-director is an employee depends on ‘all of the incidents of the relationship . . . with no one factor being decisive.’ ” Id., 450-51 quoting Nationwide, 503 U.S. at 324.[13]
Dr. Theroux signed a contract with BVDA entitled “Employment Agreement." This document, however, is not in and of itself dispositive of Dr. Theroux’s relationship with the corporation. The court must review “all the incidents of the relationship” in order to make a status determination.

A.Ownership

Dr. Theroux invested her money in BVDA, purchasing 25% of the company’s shares for $15,770. She owned 25% of the company’s assets and was liable for its debts and obligations.

B. Remuneration

Under the terms of the Employment Agreement, Dr. Theroux’s compensation was tied to the amount of business she generated for BVDA. In addition, Dr. Theroux was also entitled to 25% of BVDA’s yearly net income.
C. Management
Under the Shareholder Agreement, Dr. Theroux had voting rights with respect to:
(1) amendment to the Articles of Incorporation and by-laws of BVDA; (2) the purchase of dental and office equipment; (3) setting salaries, pensions, and benefits of any or all of the shareholders and employees; and (4) hiring staff.[14] Dr. Theroux was also required to attend monthly meetings to “discuss administrative issues” including (1) clinical patient management; (2) data management; (3) financial management, including collections, accounts receivable, and accounting; (4) staff management, including reviews, meetings, and controls; (5) “strategizing” and marketing; and (6) general administration, including inventory control, equipment and office maintenance, and future space planning. However, for the first five years of the agreement Dr. Singer was to “seek the advice of [Dr.] The-roux” but had “unilateral authority regarding . . . [m]anagement of practice operations.”

D.BVDA’s Control of Theroux

In accordance with the Employment Agreement, Dr. Theroux was “employed pursuant to the terms of [the] Agreement to practice dentistry on behalf of [BVDA]” and was required to perform her duties “in accordance with such standards of professional conduct and practice as may from time to time ... be required or recommended by [BVDA].” BVDA had “complete authority with regard to the acceptance of treatment of or refusal to treat any patient and . . . with regard to establishment of the appropriate fee for professional services.” All new patients were assigned on a basis of first availability or patient request.[15] Dr. Theroux was required to perform all dentistry services that were assigned to her and all of Dr. Theroux’s work was “subject to the review and study of [BVDA].” Dr. Theroux’s work was to be “performed at such times and at such places determined by [BVDA] and in accordance with such rules as [BVDA] might establish, consistent with the ethics and rules governing the practice of dentisty.”[16]
The Employment Agreement sets forth seven events that would trigger the termination of the agreement: (a) Dr. Theroux’s death, retirement, withdrawal or permanent disability; (b) Dr. Theroux’s disqualification or suspension from the practice of dentistry in the Commonwealth of Massachusetts; (c) Dr. Theroux being convicted of a felony; (d) embezzlement of corporate funds; (e) mutual agreement in writing between BVDA and Dr. Theroux to terminate the contract; (f) the absence of Dr. Theroux for a period of thirty (30) days without just cause; and (g) Dr. Theroux’s substantial breach of performance obligations under the contract.[17]
Taking all these factors into consideration, Dr. The-roux appears to have been an employer not an employee of BVDA for the purposes of c. 15 IB. While Dr. Theroux signed an “Employment Agreement” which gave BVDA control over her patient assignments and scheduling and made her work subject to the review and study of the corporation, she was not required to report to someone higher in the organization and she participated in policymaking and firm governance; she was to be consulted regarding all management issues and attended monthly meetings to discuss administrative affairs. Dr. Theroux also maintained voting rights concerning corporate assets and the hiring and compensation of staff. While Dr. Singer ultimately had unilateral authority regarding the practice’s manage *191 ment, the fact that one stockholder wields more power than others, does not support a finding that the others are “employees.” See Serapion, 119 F.3d at 992 (“a person with the requisite attributes of proprietary status is properly considered a proprietor, not an employee, regardless of the fact that others in the firm may wield more power”). Significantly, Dr. Theroux also invested money in BVDA, owned 25% of its stock and assets, was liable for its debts and obligations and was compensated, in part, based upon BVDA’s profits.
Having found that Dr. Theroux was not an employee of BVDA, it follows that she is not subject to the requirements of c. 15 IB. Accordingly, she is not barred by that statute from bringing claims for violations of MERA or breach of contract against the defendants.

III. Massachusetts Equal Rights Act

The Massachusetts Equal Rights Act provides, in pertinent part, that:
All persons within the commonwealth, regardless of sex, race, color, creed or national origin shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactations of every kind, and to no other.
G.L.c. 93, § 102(a) (emphasis added). Massachusetts appellate courts have not interpreted the phrase “to make and enforce contracts.” The United States Supreme Court, however, has analyzed the identical phrase in 42 U.S.C. §1981, MERA’s federal counterpart. [18] The Supreme Court found that, in the context of an employment agreement, “the right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established” because “postformation conduct does not involve the right to make a contract, but rather implicates the performance of established contract obligations.” Patterson v. McLean Credit Union, 491 U.S. 164, 171 (1989).[19] While it has been established that Dr. Theroux was not an employee of BVDA, she faces the same restrictions in regards to the Stock Purchase Agreement as she would with an employment agreement; any discriminatory postformation conduct by Dr. Singer is not subject to MERA. Accordingly, Dr. Theroux’s MERA claim based upon Dr. Singer’s exercise of the Deemed Withdrawal Provision must be dismissed with respect to her right to make and enforce contracts.
With respect to Dr. Theroux’s right to purchase and hold personal property, also protected by MERA, Dr. Theroux has stated facts sufficient to survive a motion to dismiss; by exercising the Deemed Withdrawal Provision for an allegedly discriminatoiy purpose, Dr. Singer improperly interfered with Dr. Theroux’s right to hold BVDA stock on the basis of her sex. Accordingly, Dr. Theroux’s MERA claim with respect to her right to hold personal property must stand.

IV. Breach of Contract

Under Massachusetts Law, “the covenant of good faith and fair dealing is implied in every contract.” UNO Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376 (2004). This implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Id. at 384-85. “(T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties.” Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215 (1st Cir. 2005). Therefore, the plaintiff need only show a lack of good faith, and is not required to show that the defendant acted in bad faith. UNO Restaurants, 441 Mass. At 385. A violation of these implied duties can be established when a party’s actions are contrary to a strong public policy, such as exercising a statutory right or privilege. See e.g. King v. Driscoll, 418 Mass. 576, 582 (1994) (an at-will employee has a cause of action for wrongful termination if the termination violates a clearly established public policy); Flesner v. Technical Communications Corp., 410 Mass. 805, 810-11 (1991) (wrongful termination where at-will employee was terminated for cooperating with Customs officials in investigation of employer); Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. 145, 149 (1989) (redress available for at-will employees who are terminated ‘for asserting a legally guaranteed right’ such as filing a workers’ compensation claim); DeRose v. Putnam Management Co., 398 Mass. 205, 209-11 (1986) (termination wrongful where at-will employee was terminated for refusing to testify falsely at trial).
Dr. Theroux alleges that Dr. Singer breached the covenant of good faith and fair dealing by invoking the Deemed Withdrawal Provision because of Dr. Theroux’s pregnancy, thus undoing the Stock Purchase Agreement and denying her the benefits of the contract in violation of strong public policies in the Commonwealth against pregnancy discrimination. Dr. Theroux has supported this claim with facts sufficient to survive a motion to dismiss: (1) Dr. Singer had tried to insert a clause in the contract that prohibited Dr. Theroux from having more children; (2) several incidents demonstrated Dr. Singer’s frustration with dealing with maternity leave within BVDA; (3) Dr. Singer exercised the Deemed Withdrawal Provision soon after Dr. Theroux announced that she was pregnant; and (4) the defendants never raised any issues regarding Dr. Theroux’s quality of work or performance. Accord-
*192 ingly, the defendants’ motion to dismiss Dr. Theroux’s breach of contract claim must be denied.[20]

ORDER

For the foregoing reasons, it is hereby ORDERED that the defendants’ Motion to Dismiss is ALLOWED as to Dr. Theroux’s MERA claim so far as it pertains to her right to make and enforce contracts and DENIED with respect to the rest of her complaint. The Court takes no action on the defendants’ Alternative Motion for Summary Judgment without prejudice to refiling of such motions, if any, in due course.

While Dr. Singer’s motion seeks summary judgment, in the alternative, he has yet to file an answer in the case. Accordingly, the court declines the invitation of the moving party to treat it as a motion for summary judgment, giving the defendant an opportunity to affirm or deny the plaintiffs statement of facts and the parties to conduct discovery in the ordinary course.

At the hearing held on November 9, 2005, the court invited the parties to supplement their memoranda with any decisions that may have been issued by the Massachusetts Commission Against Discrimination that bore on the issues presented by this motion. The parties filed supplemental memoranda that were received by February 2, 2006.

St. 2002, c. 223, § 1, approved Aug. 7, 2002, effective Nov. 5, 2002, substituted “300 days” for “six months.” The longer limitations period applies to alleged discrimination claims arising after the effective date of the amendment.

MCAD investigates the claim, and, if a commissioner finds probable cause for crediting the allegations of the complaint, “he shall immediately endeavor to eliminate the unlawful practice complained of... by conference, conciliation and persuasion.” G.L.c. 151B, §5.

A Civil action may only be brought “at the expiration of ninety days after the filing of a complaint with the commission, or sooner if a commissioner assents in writing." G.L.c. 151B, §9.

In construing Massachusetts statutes, courts are ordinarily guided by the construction given similar Federal statutes by the Federal courts. Howard v. Burlington, 399 Mass. 585, 589 (1987).

Title VII, itself, provides little guidance and defines an employee only as “an individual employed by an employer.” 42 U.S.C. §2000e(f).

The factors set forth in Serapion “provid[ed] additional guidance” to the MCAD in making an employer/employee status determination in Zereski v. American Posted Workers Union, Central Massachusetts Local 4553, Docket No. 95-SEM-0097. In Zereski, the MCAD determined that the members of a union’s executive board were not employees for the purposes of c. 151B.

The court further noted:
Status determinations are necessarily made along a continuum. The cases that lie at the polar extremes will prove easy to resolve. The close cases, however, will require a concerned court to make a case-specific assessment of whether a particular situation is nearer to one end of the continuum or the other... Given these verities, any effort to formulate a hard-and-fast rule would likely result in a statement that was overly simplistic, or too general to be of any real help, or both. Id,

The ADA, like Title VII, defines an employee as “an individual employed by an employer.” 42 U.S.C. §12111(4).

The EEOC’s guidelines state that they apply to all federal antidiscrimination laws within the EEOC’s purview, including Title VII. EEOC Compliance Manual, §605.0001 (“This Section discusses coverage, timeliness, and other threshold issues to be considered when a charge is first filed under Title VH of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 (ADEA), the Americans with Disabilities Act (ADA), or the Equal Pay Act of 1963 (EPA)”).

The status determination analysis set forth by the Court in Clackamus has been applied to Title VII as well as ADA cases. See e.g. Solon v. Kaplan, 398 F.3d 629 (7th Cir. 2005). The Court signaled that its analysis would extend to Title VII cases by noting that it was resolving a conflict among the Circuits that was “not confined to the particulars of the ADA” and citing to Title VII and ADEA cases as evidence of the split. Clackamus, 538 U.S. at 444 n.3.

Dr. Theroux was also to be “involved in staff disciplinary and scheduling issues.”

Patients that Dr. Theroux had regularly treated in the 36 months prior to her employment with BVDA were considered her patients.

Dr. Theroux’s hours of employment were set by BVDA “within reasonable standards of the profession.”

Dr. Theroux’s employment and relationship with BVDA could also be terminated, up until January 1, 2004, by Dr. Singer’s exercise of the deemed withdrawal clauses contained in both the Employment Agreement and the Stock Redemption Agreement.

 42 U.S.C. §1981 states in pertinent part:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of all persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In response to Patterson, Congress in 1991 amended §1981 to expand the definition of “make and enforce contracts” to include “performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.” See P.L. 102-166, 105 Stat. 1071. The Massachusetts Legislature, however, has never amended MERA to broaden the scope of this phrase in the Commonwealth.

Dr. Singer claims that Dr. Theroux’s breach of contract claim is barred by the “Settlement Agreement and Limited Release” (the “Release”) signed by the parties on August 4, 2004. The Release provided a waiver by Dr. Theroux of any claims she might have against the defendants flowing from her tenure at BVDA. However, the release contained the following exception to the general waiver:
Nothing stated or implied herein shall act as a release or waiver by Theroux . . . against Releasees, whatsoever, in law or at equity, relating to, pertaining to, based upon or emanating from a gender and/or pregnancy based discrimination action pursuant to state or federal law . . .
The breach of contract claim against Dr. Singer is based on a breach of the implied covenant of good faith and fair dealing due to his exercise of the Deemed Withdrawal Provision in violation of the strong public policy against pregnancy discrimination. This claim is “relating to, pertaining to, based upon, or emanating from gender and/or pregnancy discrimination” and therefore falls within the exception to the Release.