Smallwood v. Liberty Mutual Ins.        CV-98-351-B    03/06/00
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Deborah M. Smallwood**

   **v.**                                  Civil No. 98-351-B
                                           Opinion No. 2000 DNH 057
**Liberty Mutual Insurance Company**



MEMORANDUM AND ORDER


Deborah Smallwood brings this employment discrimination
action against Liberty Mutual Insurance Company, her former
employer.  Smallwood claims that Liberty Mutual engaged in sex-
based discrimination in violation of Title VII, 42 U.S.C. § 2000e
et seq., and the Equal Pay Act, 29 U.S.C. § 206(d)(1), by failing
to promote and compensate her in the same manner as equally
qualified men.[1]  Liberty Mutual has moved for summary judgment on
Smallwood's Title VII claim, arguing that: (1) Smallwood cannot
recover for at least some of Liberty Mutual's allegedly

---

[1]  Smallwood also originally brought a claim under 42 U.S.C.
§ 1981a, along with pendent state law claims.  These claims were
dismissed at an earlier stage of the proceedings.

discriminatory acts because they occurred more than 300 days

before she filed her administrative charge with the New Hampshire Commission on Human Rights (NHCHR) and the Equal Employment Opportunity Commission (EEOC); (2) at least some of the employment decisions that form the basis for Smallwood's claim do not constitute "adverse actions" within the meaning of Title VII; and (3) Smallwood has not presented sufficient evidence that Liberty Mutual's explanation for its actions was a pretext for discrimination.[2]

Liberty Mutual also has moved for partial summary judgment on Smallwood's Equal Pay Act (EPA) claim, contending that: (1) a two-year limitations period applies to Smallwood's EPA claim because she has failed to present sufficient evidence of a

---

[2] Liberty Mutual also challenges Smallwood's claims that she was constructively discharged and that she is entitled to recover front pay. I need not consider Liberty Mutual's objections to Smallwood's constructive discharge claim because she abandoned the claim at the final pretrial conference. Although Smallwood has not explicitly abandoned her front pay claim, I reject it both because it is dependant upon her constructive discharge claim and because Smallwood concedes that she moved to a more highly compensated position with another employer almost immediately after resigning from Liberty Mutual, see Def.'s Mot. for Summ. J. (Doc. #38), Ex. A (Smallwood Dep. 6/16/99) at 41-42.

willful violation; and (2) Smallwood's damages under the EPA are

accordingly limited to back pay for the period between June 3, 1996 and her resignation from Liberty Mutual on October 17, 1997.

For the reasons provided below, I grant Liberty Mutual's motion in part and deny it in part.

## I.    FACTS

Liberty Mutual is a nationwide provider of insurance. The company hired Smallwood as an entry level programmer in its information systems department in December 1978. Smallwood began her career at Liberty Mutual at grade 10 on the company's position classification scale, earning approximately $10,200 per year.

Liberty Mutual's information systems department is responsible for overseeing all of the company's computer systems. Throughout her tenure at Liberty Mutual, Smallwood worked in the department's commercial markets division. This division is responsible for maintaining the computer applications used by Liberty Mutual's commercial insurance business.

During her first fifteen years at Liberty Mutual, Smallwood

advanced through the ranks of the information systems department, receiving a series of promotions that took her into management-level positions.[3] By 1993, she had become a "Director," a grade 18 position with an annual salary of approximately $70,000. At that time, Smallwood was managing approximately 35 to 40 people and was responsible for a budget of approximately $4 million.

During 1994 and 1995, Smallwood's degree of responsibility within the commercial markets division continued to increase. She went from managing 35 to 40 employees and a budget of $4 million to managing approximately 90 employees and a budget of approximately $12 million. During this period, however, Smallwood remained at grade 18. As a result, she was not eligible for participation in the company's Management Incentive Compensation (MIC) bonus plan, which provided managers at grade 19 and above with an opportunity to earn substantial performance-

---

[3] Under the classification system used in the information systems department during the relevant period, grades 16 to 20 were considered management level positions. Executives at the level of vice president and above were not part of the classification system.

based bonuses.

In June 1994, Liberty Mutual hired Terry Conner as the company's Chief Information Officer.  In this capacity, Conner was in charge of managing the information systems department.  In January 1996, Conner hired Richard Connell as the department's Commercial Markets Information Officer.  Connell was thus the chief manager of the commercial markets division, the part of the information systems department in which Smallwood worked.  As a result, Connell became Smallwood's immediate supervisor.

Acting through Conner and Connell, Liberty Mutual hired a series of men from outside the company to fill high-level management positions within the information systems department.[4] Among these new hires, Smallwood's claim focuses on two individuals in particular: (1) Hardat Ramkhelawan, who began employment as Manager, Applications Portfolio in November 1996,

_____

[4]  While my analysis follows Smallwood's objection in focusing on the Ramkhelawan and Cartnick hires, Smallwood also identifies a number of other men (e.g., Jack Santos and Daniel Bravo) whom Liberty Mutual hired for senior management positions in the information systems department during the same general period.

and (2) E. Cody Cartnick, who began employment as Manager, Strategic Applications in June 1997. Both men were paid more than Smallwood in their new positions and entered Liberty Mutual at a higher grade level.

The hiring of Ramkhelawan and Cartnick affected Smallwood's responsibilities and status within the department. Connell assigned Ramkhelawan many responsibilities that had formerly been within Smallwood's domain. At about the same time, Connell told Smallwood that she would be promoted to a new accounts manager position that he was planning to create. Rather than promoting Smallwood, however, Connell assigned her to manage the "Liberator" project, which involved rewriting the computer programming for Liberty Mutual's workers' compensation insurance line. Further, Smallwood no longer directly reported to Connell after Cartnick was hired.

As early as March or April of 1993, Smallwood began to believe that she had encountered a "glass ceiling" that prevented women from advancing into the top levels of management in the

information systems department.  On numerous occasions between the 1993 and 1997, Smallwood complained about a glass ceiling and about being undercompensated.  She made these complaints to various people in the information systems department, including her superiors in the department (Conner and Connell) and Maxine Gerauld and Margaret Guillet (now Fredrickson), members of the department's human resources staff.  In her April 1995 annual performance review, Smallwood wrote: "[T]his past year was the first time I felt the glass ceiling as a woman manager at Liberty Mutual.  Although I do not see deliberate or intentional discremination [sic] by [information systems] management or by my peer group, I do feel and see the impact on my career by being a woman manager in a very strong male networked organization."

From 1993 through 1997, Smallwood earned positive reviews in her annual performance evaluations.  In every year but one during that period, her overall rating was a "2," which means that she exceeded most expectations.  In one year she was rated as a "3," which means that she met expectations.  Notwithstanding these

positive reviews, Smallwood remained at grade 18 from 1993 until July 1997, when she was promoted to grade 19.[5]  As a result of this promotion, her salary was raised to approximately $95,000 and she became eligible to participate in the MIC bonus plan.

Despite her promotion, Smallwood became frustrated by her failure to earn further promotion and higher compensation.  In August 1997, after speaking with Connell and others at Liberty Mutual about her growing frustration, Smallwood resolved to seek employment elsewhere.  She subsequently interviewed with the firm of KPMG Peat Marwick (KPMG), which offered her a position. Smallwood resigned from Liberty Mutual on October 17, 1997, and shortly thereafter began employment at KPMG.  Her starting salary at KPMG was $140,000.

Smallwood filed a charge of discrimination with both the NHCHR and the EEOC on November 19, 1997.  Smallwood received a right-to-sue notice from the EEOC on April 2, 1998 and filed the

_____

[5]  The evidence suggests that Connell recommended Smallwood for promotion to grade 19 in April 1997, but that she actually received the promotion in July 1997.

-10-

original verified complaint in this action on June 3, 1998.[6]

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate only "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
6(c); <u>see</u> <u>also</u> <u>DeNovellis v. Shalala</u>, 124 F.3d 298, 305 (1st Cir.
1997).  A material fact is one "that might affect the outcome of
the suit under the governing law"; a genuine factual issue exists
if "the evidence is such that a reasonable jury could return a
verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby,
Inc.</u>, 477 U.S. 242, 248 (1986).

The party moving for summary judgment "bears the initial
responsibility of informing the district court of the basis for
its motion, and identifying those portions of [the record] which

_____

[6]    Smallwood filed a First Amended Verified Complaint on
July 9, 1998.

-11-

it believes demonstrate the absence of a genuine issue of material fact." DeNovellis, 124 F.3d at 306 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted) (alteration in original). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party, which must "produce evidence on which a reasonable trier of fact, under the appropriate proof burden, could base a verdict for it; if the party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 77 U.S. at 323; Anderson, 477 U.S. at 249). When ruling on a motion for summary judgment, I must construe all the evidence produced by the parties in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Thomas v. Eastman Kodak Co., 183 F.3d 38, 42 (1st Cir. 1999), cert. denied, --- S.Ct. ---, 2000 WL 36218 (Feb. 22, 2000).

In an appropriate case, where the relevant facts are

sufficiently clear, issues of timely filing can be decided on summary judgment. See Morris v. Government Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990). In addition, while courts must exercise particular restraint in granting summary judgment in cases in which the nonmoving party must prove motive or intent, summary judgment may be granted if the nonmoving party "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." DeNovellis, 124 F.3d at 306 (quoting Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994)) (internal quotation marks omitted).

## III. ANALYSIS

### A. Smallwood's Title VII Claim

#### 1. The Timely Filing Requirement

Liberty Mutual contends that Smallwood is barred from recovering for any act of discrimination that accrued more than 300 days before she filed her administrative charge of

discrimination.[7]  As explained below, I agree.

Title VII requires an aggrieved person to exhaust his or her administrative remedies as a prerequisite to filing suit in federal court.  See Lawton v. State Mut. Life Assurance Co. of Am., 101 F.3d 218, 221 (1st Cir. 1996); Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990).  To comply with this requirement, an individual must file a charge with the Equal Employment Opportunity Commission "within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1) (1994); see also Delaware State College v. Ricks,

---

[7]  The First Circuit has adopted a "notice standard" for determining when an employment discrimination claim accrues for limitations purposes.  "[T]he notice standard is met and the statute of limitations is triggered only if 'the implications [of the discriminatory practice] have crystallized' and 'some tangible effects of the discrimination were apparent to the plaintiff,' i.e. if 'the plaintiff is aware that he will in fact be injured by the challenged practice.'"  Thomas v. Eastman Kodak Co., 183 F.3d 38, 50 (1st Cir. 1999) (quoting Johnson v. General Elec., 840 F.2d 132, 136-37 (1st Cir. 1988)) (alteration added), cert. denied, --- S.Ct. ---, 2000 WL 36218 (Feb. 22, 2000).  In other words, "accrual commences when a plaintiff knows, or has reason to know, of the discriminatory act that underpins his cause of action."  Morris v. Government Dev. Bank of Puerto Rico, 27 F.3d 746, 748-49 (1st Cir. 1994) (action under § 1983).

449 U.S. 250, 256 (1980); <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d 38, 47 (1st Cir. 1999), <u>cert. denied</u>, --- S.Ct. ---, 2000 WL 36218 (Feb. 22, 2000).  In a "deferral" state such as New Hampshire, this filing period is extended to three hundred days. <u>See</u> 42 U.S.C. § 2000e-5(e)(1); 29 C.F.R. § 1601.74 (1999) (listing the NHCHR as a designated agency); <u>Provencher v. CVS Pharmacy, Div. of Melville Corp.</u>, 145 F.3d 5, 13 (1st Cir. 1998) (charge filed in New Hampshire); <u>Madison v. St. Joseph Hosp.</u>, 949 F. Supp. 953, 957-58 (D.N.H. 1996).[8]

---

[8]  In certain circumstances, the filing requirements for complainants in deferral states may be more complicated.  Title VII provides that a person in a deferral state must file a charge with the appropriate state agency within 240 days of the alleged discriminatory act and with the EEOC within 300 days of that act. <u>See</u> <u>Sabree v. United Bhd. of Carpenters and Joiners</u>, 921 F.2d 396, 399 (1st Cir. 1990).  However, some state civil rights agencies have entered into "worksharing agreements" with the EEOC under which the two agencies are agents of one another for purposes of receiving charges and the state agency waives its sixty-day exclusive jurisdiction over such charges. <u>See, e.g.</u>, <u>Madison</u>, 949 F. Supp. at 958 (interpreting 1994 EEOC-NHCHR worksharing agreement).  Because the charge that Smallwood filed with the NHCHR on November 19, 1997 was "dual-filed" with the EEOC, I need not address these complexities, and may calculate the proper limitations period simply by counting back 300 days from the dual filing date.

The requirement that Title VII plaintiffs make a timely administrative filing to preserve their right to sue in federal court reflects a balance, struck by Congress, between the interests of employees and those of employers. On the one hand, the filing period "guarantee[s] the protection of the civil rights laws to those who promptly assert their rights." Ricks, 449 U.S. at 256; see also Thomas, 183 F.2d at 47. On the other hand, it "also protect[s] employers from the burden of defending claims arising from employment decisions that are long past." Ricks, 449 U.S. at 256-57; see also Thomas, 183 F.3d at 47.

The filing period operates as a statute of limitations, not a rule of evidence. Unless one of the exceptions discussed below applies, a discriminatory act that occurred outside of the limitations period cannot create liability. See United Air Lines, Inc. v. Evans, 431 U.S. 553, 555 n.4, 558 (1977); DeNovellis v. Shalala, 124 F.3d 298, 309 n.5 (1st Cir. 1997). Evidence of timed-out acts of discrimination may, however, be admitted against a defendant to prove timely claims. See Evans,

-16-

431 U.S. at 558; <u>DeNovellis</u>, 124 F.3d at 309 n.5; <u>Sabree v. United Bhd. of Carpenters and Joiners</u>, 921 F.2d 396, 400 n.9 (1st Cir. 1990).

Title VII's requirement that complainants file a timely charge with the EEOC and/or the appropriate state agency does not create a jurisdictional bar to filing a suit in federal court. See <u>Zipes v. Trans World Airlines, Inc.</u>, 455 U.S. 385, 393, 398 (1982); <u>Bonilla v. Muebles J.J. Alvarez, Inc.</u>, 194 F.3d 275, 278 (1st Cir. 1999) (applying Title VII charge-filing requirement in ADA case). Consequently, the period for filing an administrative charge, like a statute of limitations, is subject to equitable modification when necessary to protect fundamental fairness. See <u>Zipes</u>, 455 U.S. at 393, 398; <u>Bonilla</u>, 194 F.3d at 278; <u>Morris v. Government Dev. Bank of Puerto Rico</u>, 27 F.3d 746, 750 (1st Cir. 1994).

### a. Continuing Violation Doctrine

The First Circuit has recently noted that "[t]he continuing violation doctrine creates an equitable exception to the 300-day

limitation [period] when the unlawful behavior is deemed ongoing." Provencher, 145 F.3d at 14. Although commentators have described the doctrine as "arguably the most muddled area in all of employment discrimination law," see B. Lindemann & P. Grossman, Employment Discrimination Law 1351 (3d ed. 1996),[9] it is as important as it is difficult, because establishing a continuing violation allows a Title VII plaintiff to "reach back" and obtain remedies for acts of discrimination that would otherwise be time barred. See Provencher, 145 F.3d at 14; Sabree, 921 F.2d at 400-01. In other words, "[i]f a Title VII violation is of a continuing nature, the charge of discrimination filed with the appropriate agency may be timely as to all discriminatory acts encompassed by the violation so long as the

---

[9] The law of continuing violations has been described as "both complicated and confusing, in part because there are a number of different theories under which the courts have found such violations to exist, in part because the discussion in many of the cases is less than clear, and in part because some of the fact situations involved in the cases, and also some of the concepts involved, pose very difficult line-drawing problems." Sabree, 921 F.2d at 400 (quoting B. Schlei and P. Grossman, Employment Discrimination Law 884 (1976)).

-18-

charge is filed during the life of the violation or within the statutory period (e.g., 300 days) which commences upon the violation's termination." Kassaye v. Bryant College, 999 F.2d 603, 606 (1st Cir. 1993).

The First Circuit has recognized two varieties of continuing violations: serial violations and systemic violations. See, e.g., Thomas, 183 F.3d at 53; Provencher, 145 F.3d at 14; DeNovellis, 124 F.3d at 307. Both theories potentially are applicable to cases alleging a discriminatory failure to promote, particularly when the defendant has engaged in an ongoing course of conduct that makes it difficult to identify a "single act of discrimination sufficient to trigger the running of the limitations period." Cajigas v. Banco de Ponce, 741 F.2d 464, 470 (1st Cir. 1984); see also Jensen, 921 F.2d at 522 (noting that the continuing violation doctrine may apply when a plaintiff claims to have been "passed over several times for promotion, based on the same (actionable) animus"). In opposition to Liberty Mutual's motion for summary judgment, Smallwood maintains

that she has alleged and substantiated both types of continuing violation. See Pl's Obj. (Doc. #40) at 1; Mem. in Supp. of Pl.'s Obj. (Doc. #40) at 10-18.

### i. Serial Violation

A serial violation consists of "a number of discriminatory acts emanating from the same discriminatory animus, [with] each act constituting a separate wrong actionable under Title VII." Thomas, 183 F.3d at 53 (quoting DeNovellis, 124 F.3d at 307); see also Lawton, 101 F.3d at 221; Kassaye, 999 F.2d at 606.

To sustain a serial violation claim, a plaintiff must prove that at least one act in the series occurred within the limitations period. See DeNovellis, 124 F.3d at 307; Lawton, 101 F.3d at 221-22; Sabree, 921 F.2d at 400. The timely violation, sometimes dubbed the "anchor violation," must itself be an actionable wrong under Title VII. See Provencher, 145 F.3d at 14. A plaintiff cannot establish a serial violation merely by showing that the effects of untimely acts of discrimination continued into the limitations period. See DeNovellis, 124 F.3d

-20-

at 309 (citing Evans, 431 U.S. at 558); Kassaye, 999 F.2d at 606 (same).

A plaintiff invoking the serial violation doctrine must also demonstrate "that the timely acts are linked to the untimely acts by similarity, repetition or continuity." Provencher, 145 F.3d at 15. If the acts are not substantially related in character and time, then they cannot comprise a serial violation. See id.; Sabree, 921 F.2d at 401; West v. Philadelphia Elec. Co., 45 F.3d 744, 755 (3d Cir. 1995) ("The relevant distinction is between the occurrence of isolated, intermittent acts of discrimination and a persistent, on-going pattern.").

The First Circuit has made reference to a set of factors originally developed by the Fifth Circuit to determine whether alleged acts of discrimination are sufficiently related to constitute a serial violation. These factors are: (1) subject matter, i.e., "[Did] the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation?" (2) frequency, i.e., "[Were] the alleged acts

reoccurring . . . or more in the nature of an isolated work assignment or employment decision?" and (3) permanence, i.e., "[Did] the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?" Smith v. Bath Iron Works Corp., 943 F.2d 164, 166 (1st Cir. 1991) (quoting Berry v. Board of Supervisors of L.S.U., 715 F.2d 971, 981 (5th Cir. 1983)) (internal quotation marks omitted).

The First Circuit has indicated that it considers permanence to be the most important of the Berry factors. See Sabree, 921 F.2d at 402. Permanence, according to the First Circuit, involves "an inquiry into what the plaintiff knew or should have known at the time of the discriminatory act." Id. A plaintiff who knew or should have known that she was the victim of discrimination while the earlier, untimely acts were occurring

cannot take advantage of the serial violation doctrine, because "[a] knowing plaintiff has an obligation to file promptly or lose [her] claim." Id.; see also Provencher, 145 F.3d at 14; Bath Iron Works, 943 F.2d at 166. A serial violation claim may be asserted, by contrast, by "a plaintiff who is unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." Provencher, 145 F.3d at 15 (quoting Sabree, 921 F.2d at 402). "What matters is whether, when, and to what extent the plaintiff was on inquiry notice." Jensen, 912 F.2d at 522. This so-called "revelatory standard" reflects the purpose of the continuing violation doctrine, which "is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred." Provencher, 145 F.3d at 15 (quoting Speer v. Rand McNally & Co., 123 F.3d 658, 663 (7th Cir. 1997)) (internal quotation marks omitted).

Smallwood cannot satisfy the revelatory standard even if I

assume for purposes of analysis that she has produced sufficient evidence to reach a jury on the other elements of a serial violation claim. In her amended verified complaint and again in her deposition, Smallwood attested that as early as 1993 she had developed the conviction that Liberty Mutual had a "glass ceiling" that precluded her and other women from advancing into the upper echelons of management within the information systems department. See First Am. Verified Compl. (Doc. # 2) ¶¶ 24, 25; Def's Mot. for Summ. J. (Doc. #38), Ex. A (Smallwood Dep. 6/16/99) at 71.[10] On various occasions prior to 1997, Smallwood complained to her superiors and to members of her department's human resources staff that she was facing a sex-related barrier to career advancement. See First Am. Verified Compl. (Doc. #2) ¶¶ 36, 37; Def's Mot. for Summ. J. (Doc. #38), Ex. A (Smallwood

_____

[10] Because Smallwood filed a verified complaint executed before a notary public, I may treat factual averments that are based on her personal knowledge, that she is competent to attest to, and that would be admissible in evidence as if they had been made in an affidavit submitted in opposition to Liberty Mutual's summary judgment motion. See Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991).

-24-

Dep. 6/16/99) at 71, 83-86, 93-94.  Moreover, Smallwood's deposition is replete with evidence that beginning in March or April 1993 and continuing throughout the next several years, she believed that she was being denied opportunities and compensation because of her sex.  <u>See</u> Def.'s Mot. for Summ. J. (Doc. #38), Ex. A (Smallwood Dep. 6/16/99) at 42-43, 77-78, 84, 85, 86, 91-93.

This evidence establishes that Smallwood knew or should have known prior to the limitations period that she had a colorable Title VII claim. Because Smallwood "was or should have been aware that [s]he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place," her serial violation claim must fail. Provencher, 145 F.3d at 14; see also Bath Iron Works, 943 F.2d at 166; Sabree, 921 F.2d at 402.

Smallwood attempts to remedy her inability to satisfy the revelatory standard by arguing that she delayed filing a discrimination charge because she was deceived by her supervisor's misleading promises to promote her. See Mem. in Supp. of Pl.'s Obj. (Doc. #40) at 11-12, 14-15, 16. While Smallwood advances this argument in the context of her serial violation claim, it is more properly framed as an argument for equitable modification.[11]

_____

[11] In American Airlines, Inc. v. Cardoza-Rodriguez, 133 F.3d 111, 124 (1st Cir. 1998), a recent case brought under the Age Discrimination in Employment Act (ADEA), the First Circuit distinguished between equitable tolling and equitable estoppel. See also Kale v. Combined Ins. Co. of Am., 861 F.2d 746, 752 (1st Cir. 1988) (making same distinction). Equitable tolling, the

The First Circuit has taken a narrow view of equitable exceptions to Title VII's limitations periods. See Thomas, 183 F.3d at 53; Rys v. U.S. Postal Serv., 886 F.2d 443, 446 (1st Cir. 1989); Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 185 (1st Cir. 1989). To benefit from equitable modification, Smallwood must prove not only that her employer actively misled her and that she reasonably and detrimentally relied upon the employer's misrepresentation, but also that she was unaware of her employer's discriminatory animus toward her when the misrepresentation was made. See Morris, 27 F.3d at 750; Jensen, 912 F.2d at 521. A Title VII plaintiff cannot "find succor in equity" if she was not diligent in pursuing her claims. Rys, 886

_____

court explained, is appropriate when the plaintiff "demonstrates 'excusable ignorance' of his statutory rights." Cardoza-Rodriguez, 133 F.3d at 124. Equitable estoppel, by contrast, may be invoked "when an employee is aware of his [statutory] rights, but does not make a timely filing due to his reasonable reliance on his employer's deceptive conduct." Id. Applying this useful distinction, the issue raised by Smallwood is more properly characterized as one of equitable estoppel. However, because other First Circuit opinions have not always distinguished between the two varieties of equitable modification, I use more general terminology in my discussion.

F.2d at 446.

Smallwood has produced evidence that in November 1996, Richard Connell, her immediate supervisor, promised her that she would receive one of several accounts manager positions that he planned to create. See Pl.'s Obj. (Doc. #40), Ex. 3 (Connell Dep.) at 59-60.[12] She contends that "Connell probably never intended, and certainly did not have the authority, to create such a job for her," and that "she was duped by this promise, until June 1997." Mem. in Supp. of Pl.'s Obj. (Doc. #40) at 11-12. Smallwood thus suggests that her reliance on Connell's promise excuses her failure to file a timely claim between November 1996 and June 1997. See id. at 14-15.

Smallwood's bid for equitable modification fails for the same reason that she cannot successfully establish a serial

_____

[12] Smallwood has also sought to demonstrate that Connell misled her about the size and importance of the "Liberator project" that she was assigned to manage. See First Am. Verified Compl. (Doc. #2) at ¶¶ 61-65; Pl.'s Obj. (Doc. #40), Ex. 3 (Connell Dep.) at 57-58, 62-63. This argument fails to trigger equitable estoppel for the same reasons provided in my analysis of the promised accounts manager position.

violation.  As discussed above, the evidence in the record shows that Smallwood believed beginning in March or April of 1993 and continuing into 1997 that her superiors at Liberty Mutual were discriminating against her because of her sex.  See Def.'s Mot. for Summ. J. (Doc. #38), Ex. A (Smallwood Dep. 6/16/99) at 71, 77-78, 83-86, 91-94.  In light of this evidence, Smallwood cannot demonstrate that she was unaware of Liberty Mutual's discriminatory animus when Connell made the allegedly misleading promise.  See Morris, 27 F.3d at 750; Jensen, 912 F.2d at 521.  Furthermore, the same evidence establishes that any reliance that Smallwood placed on Connell's promise was unreasonable and thus insufficient to trigger an equitable exception.  See Mercado-Garcia v. Ponce Federal Bank, 979 F.2d 890, 895-96 (1st Cir. 1992) (rejecting equitable estoppel claim based upon allegedly false promise to settle because "it is something less than 'reasonable' for a party contemplating litigation to allow itself to miss filing deadlines in 'reliance' upon such cajolling from the opposing party").  Accordingly, Smallwood has not produced

any evidence upon which a reasonable jury could find her eligible for equitable modification of Title VII's limitations period.[13]

### ii. Systemic Violation

Smallwood also attempts to rescue her untimely claims by alleging that Liberty Mutual committed a systemic violation of Title VII. "A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint." Provencher, 145 F.3d at 14 (quoting Sabree, 921 F.2d at 400 n.7) (internal quotation marks omitted). A systemic violation does

---

[13] Because I find that Smallwood cannot establish that she was unaware of her employer's discriminatory animus toward her at the time that Connell made the promises in question, I need not determine whether Smallwood has adduced sufficient evidence that Connell actively misled her, as opposed to merely breaking a promise originally made in good faith. See Kale v. Combined Ins. Co. of Am., 861 F.2d 746, 752 (1st Cir. 1988) (stating that a plaintiff must produce "[e]vidence of either the employer's improper purpose or [the employer's] constructive knowledge of the deceptive nature of [its] conduct"); Palmacci v. Umpierrez, 121 F.3d 781, 786-87 (1st Cir. 1997) (distinguishing between a broken promise and a fraudulent misrepresentation under common law).

not require a plaintiff to show that a discrete act of discrimination occurred during the limitations period.  See id.; DeNovellis, 124 F.3d at 307; Jensen, 912 F.2d at 523.  Rather, to establish a systemic violation, a plaintiff must prove that a discernible policy or practice of discrimination was in effect, and injured her, during the limitations period.  See Lawton, 101 F.3d at 222; Mack, 871 F.2d at 184.  Unlike a serial violation, which may be shown by evidence of a discrete number of discriminatory acts aimed at an individual plaintiff, a systemic violation requires evidence of an "overarching policy or practice" that applied to employees other than the plaintiff. See Provencher, 145 F.3d at 14 (noting that systemic violation claim "refers to general policies or practices"); Jensen, 912 F.2d at 523 (distinguishing between systemic and serial violations).

Smallwood claims that Liberty Mutual maintained a systemic policy or practice "of promoting . . . or hiring men from outside the company to do jobs that she and other women were at least

equally capable of doing." Mem. in Supp. of Pl.'s Obj. (Doc. #40) at 17; see also id. at 18 (contending that Liberty Mutual maintained "a long-term (systemic) practice or policy not to place women in high level jobs"). In her brief objecting to Liberty Mutual's motion, she identifies two types of evidence in an effort to prove the existence of such a policy or practice.[14]

First, Smallwood attempts to support her systemic violation claim by pointing to evidence of (1) Liberty Mutual's decisions to hire Hardat Ramkhelawan and Cody Cartnick rather than promote her into the positions filled by those men, and (2) the company's failure to promote her to grade 19 until July 1997. See Mem. in Supp. of Pl.'s Obj. (Doc. #40) at 18-20. This evidence relates solely to alleged acts of discrimination against Smallwood; it is not probative of the existence of any generally applicable

---

[14] The First Circuit has cautioned employment discrimination plaintiffs that continuing violation claims will only be considered if they are clearly set forth and substantiated. See Mack, 871 F.2d at 183-84. In keeping with the First Circuit's admonishment in Mack, when evaluating Smallwood's systemic violation claim I consider only the arguments that she expressly raises in her brief and the evidence that she cites in support of those arguments.

discriminatory policy or practice.  Accordingly, it lends no support to Smallwood's systemic violation claim.

Second, Smallwood seeks to substantiate her systemic violation claim by producing a spreadsheet showing that between December 1994 and December 1997 a disproportionate number of the high-level management positions in the information systems department were filled by men.  See Pl.'s Objection (Doc. #40), Ex. 8.  While the disparity may be marked, such statistical evidence, without more, is not enough to demonstrate the existence of an overarching policy or practice of discrimination. The First Circuit addressed this issue in Mack v. Great Atlantic and Pacific Tea Company, Inc., 871 F.2d 179 (1st Cir. 1989), another case in which a plaintiff charging a discriminatory failure to promote sought an exception to the limitations period by showing a systemic violation.  The First Circuit rejected Mack's attempt to prove a discriminatory policy or practice by means of bare statistical evidence:

> Mack presented no evidence to the district court sufficient
> to show that a discriminatory promotional policy was in

effect during the statutory period. Her effort to have us infer such a policy from statistics showing a low percentage of blacks and females in upper-level positions at A & P leaves too much to be desired. For one thing, the evidence is incomplete; we cannot tell, for example, the percentage of black or women applicants who were promoted or rejected for promotion. For another thing, we are left in the dark as to whether--and how--personnel and recruitment practices varied over time. Then, too, plaintiff proffered no expert testimony or other insights to show the probativeness of the figures, their likely statistical significance, or the inferences which might properly be drawn from them. For these reasons, the naked numbers, standing unadorned and unexplained, lacked sufficient convictive force to derail appellee's summary judgment initiative.

Mack, 871 F.2d at 184.

Smallwood's spreadsheet evidence suffers from the same shortcomings as the statistical evidence presented by the plaintiff in Mack. Mere evidence of a sex-related disparity in the upper tier of the information systems department's management, without more, cannot prove that an identifiable, overarching discriminatory policy or practice existed, and affected Smallwood, during the limitations period.[17]

---

[17] Smallwood has produced deposition testimony by Stephen Reger that she characterizes as "an interpretation of the spreadsheet statistics produced by [Liberty Mutual]." Mem. in Supp. of Pl.'s Obj. (Doc. #40) at 20. Contrary to Smallwood's

-34-

Accordingly, Smallwood has not established a systemic violation.

Because Smallwood has not produced sufficient evidence in support of her continuing violation claims, any of her Title VII claims that stem from alleged acts of discrimination that accrued before January 23, 1997 are time barred.

### 2. Unlawful Employment Practices

Liberty Mutual next argues that Smallwood's claim focuses on certain employment determinations, such the projects to which she was assigned and the supervisors to whom she reported, that cannot constitute the "adverse employment action" -- or unlawful employment practice[18] – that a plaintiff must show to make out a

---

assertion, however, Reger's testimony merely reiterates the information contained in the spreadsheet without adding any interpretative gloss to the data.  See Pl.'s Obj. (Doc. #40), Ex. 12.  Consequently, Smallwood, like the plaintiff in Mack, has given the court nothing more than "naked numbers, standing unadorned and unexplained."  Mack, 871 F.2d at 184.

[18]  In its memorandum in support of the motion for summary judgment, Liberty Mutual uses the term "adverse actions."  See Mem. in Supp. of Def.'s Mot. for Summ. J. (Doc. #38) at 16-17.  I generally use the term "unlawful employment practice," which is the language found in Title VII.  See, e.g., 42 U.S.C. §§ 2000e-2, 2000e-3, 2000e-5.

prima facie case under Title VII.[19]  See Mem. in Supp. of Def's

Mot. for Summ. J. (Doc. #38) at 16-17.  Because this argument

misconstrues the gravamen of Smallwood's complaint, I reject it.

Read in the light most favorable to her, Smallwood's

complaint alleges a number of discrete, unlawful employment

practices within the meaning of Title VII.  Specifically,

Smallwood claims that Liberty Mutual discriminated based on sex

when it refused to promote her and instead hired men (e.g.,

Ramkhelawan and Cartnick) to fill upper-level management

positions.  See First Am. Verified Compl. (Doc. #2) ¶¶ 52-54, 69-

74, 82, 84, 87-88, 108-09.  Smallwood also claims that Liberty

Mutual refused to promote her above grade 18 until July 1997,

long after she had a degree of responsibility commensurate with

that held by male managers at higher grade levels.  See id. ¶¶

20-21, 23, 108, 110.  As a direct result of Liberty Mutual's

---

[19] Because this argument challenges the legal sufficiency
of Smallwood's Title VII claim, rather than whether she has
adduced sufficient evidence to support that claim, it is more
properly framed as a motion for judgment on the pleadings, see
Fed. R. Civ. P. 12(c), than as part of a summary judgment motion.
I treat it accordingly.

discriminatory failure to promote her, Smallwood asserts, she received lower compensation, in terms of both salary level and bonus eligibility, than men with similar or lesser qualifications and responsibilities.  See id. ¶¶ 23, 33-35, 38-39, 41, 44-46, 74, 108-10.  Several of these claims -- e.g., the failure to promote Smallwood into the position filled by Cartnick in June 1997, the failure to promote Smallwood above grade 18 until July 1997, and the unequal compensation that Smallwood received as a result of the failures to promote -- are timely.

Title VII provides that "[i]t shall be an unlawful employment practice for an employer[] . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. §§ 2000e-2(a), (a)(1) (1994).  Smallwood's Title VII claim relates primarily to promotion and compensation, both of which constitute employment practices within the meaning of the Act.  See id.; Kolstad v. American

-37-

Dental Ass'n, 527 U.S. 526, ---, 119 S.Ct. 2118, 2122 (1999) (promotion); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as . . . failing to promote, . . . or a decision causing a significant change in benefits."); Donnelly v. Rhode Island Bd. of Governors for Higher Educ., 110 F.3d 2, 4, 6 (1st Cir. 1997) (compensation).

A job reassignment involving no corresponding reduction in salary, benefits, or prestige is insufficient to establish an adverse employment action. See, e.g., Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (holding that job reassignment that involved "nothing 'more disruptive than a mere inconvenience or an alteration of job responsibilities,'" without any "diminution in . . . title, salary, or benefits" was insufficient to establish the adverse employment action required to make a prima facie case of employment discrimination) (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993) (same conclusion in ADEA context)). However,

Smallwood's allegations that she was shifted to a lower position in her department's chain of command and that many of her responsibilities were reassigned to male employees, see First Am. Verified Compl. (Doc. #2) ¶¶ 55, 56, 61-62, 64-67, 70, 75, can give rise to a Title VII claim, provided that she can prove that such decisions were motivated by discriminatory animus. See, e.g., Burlington Indus., 524 U.S. at 761 (listing "reassignment with significantly different responsibilities" as a "tangible employment action"); DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (affirming that assignment of employee to position not appropriate for his skills and "the concomitant deprivation of meaningful duties" constituted an adverse employment action under Title VII); Crady, 993 F.2d at 136 (stating that "significantly diminished material responsibilities" can constitute an adverse employment action under the ADEA).[20]

---

[20] The First Circuit treats ADEA, ERISA, and FLSA cases as instructive precedents in the Title VII context. See Serapion v. Martinez, 119 F.3d 982, 985 (1st Cir. 1997), cert. denied, 522 U.S. 1047 (1998). The circuit has taken the same position with

Accordingly, I conclude that Smallwood has alleged a number of unlawful employment practices that -- if proved -- would constitute violations of Title VII.

### _____3. **Evidence of Pretext and Discrimination**

Finally, Liberty Mutual contends that it is entitled to summary judgment on Smallwood's Title VII claim because she has failed to produce sufficient evidence that the company discriminated against her on the basis of sex. See Mem. in Supp. of Def.'s Mot. for Summ. J. (Doc. #38) at 20-23; Def.'s Reply (Doc. #41) at 3-6. Although the issue is a close one, I conclude for the following reasons that Smallwood has created a triable issue as to whether Liberty Mutual discriminated against her.

Because Smallwood does not expressly frame her disparate treatment claim in terms of direct evidence and the parties

---

respect to certain claims under the FMLA and the ADA. See Hodgens v. General Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998) (FMLA); Dichner v. Liberty Travel, 141 F.3d 24, 30 n.5 (1st Cir. 1998) (ADA). Therefore, in this order I sometimes refer to opinions decided under those statutes without taking special notice of the statutory context.

appear to agree that this is a pretext (rather than a "mixed-motives") case, I apply the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).[21] Under the first step of the burden-shifting framework, a plaintiff must establish a prima facie case of discrimination by proving by a preponderance of the evidence that she is a member of a protected class, that she was denied an employment opportunity for which she was qualified, and that

_____

[21] "Courts sometimes say that the McDonnell Douglas paradigm operates only when there is no direct evidence of a discriminatory animus." Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 263 (1st Cir. 1999); see also Fernades v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999); Speen v. Crown Clothing Corp., 102 F.3d 625, 636 (1st Cir. 1996). The First Circuit has noted, however, that the line between direct and indirect evidence is often unclear, and has advised against addressing difficult and unnecessary theoretical questions in such cases. See Dominguez-Cruz v. Suttle Caribe, Inc., --- F.3d ---, 2000 WL 97676, at *3-4 (1st Cir. Feb. 2, 2000) (citing Fernades, 199 F.3d at 580-81; Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 421 (1st Cir. 1996)). Accordingly, because Smallwood has not explicitly argued that her claim is based on direct evidence, I follow the First Circuit's advice and apply the burden-shifting analysis.

after the denial the employer continued to seek persons to receive the opportunity.[22]  See Hicks, 509 U.S. at 506; Burdine, 450 U.S. at 252-53 & n.6; McDonnell Douglas, 411 U.S. at 802. The plaintiff's burden at this preliminary step is "not onerous." Burdine, 450 U.S. at 253; see also Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 584 n.4 (1st Cir. 1999) (describing nature of proof required to establish prima facie case as "de minimis"); Hodgens v. General Dynamics Corp., 144 F.3d 151, 165 (1st Cir. 1998) ("The prima facie burden is 'quite easy to meet.'") (quoting Villanueva v. Wellesley College, 930 F.2d 124, 127 (1st Cir. 1991)).  If the plaintiff succeeds in making her prima facie case, she creates a rebuttable presumption that the defendant acted in a discriminatory manner.  See Hicks, 509 U.S. at 506; Burdine, 450 U.S. at 254.

In the present case, given that Smallwood's burden is modest

---

[22]  The precise formulation of the plaintiff's prima facie case will differ depending on the type of discrimination alleged and the specific employment practice at issue.  See McDonnell Douglas, 411 U.S. at 802 n.13.  I have tailored the description of the prima facie case in the text to fit the contours of Smallwood's claim.

and that I must construe all facts in her favor, I conclude that Smallwood has established a prima facie case of discrimination. She is a woman, and therefore a member of a protected class. She has produced evidence from which a reasonable jury could conclude that Liberty Mutual failed to promote her, that she was qualified for the positions in question, and that these positions were given to men with lesser or comparable qualifications.[23] See Pl.'s Obj. (Doc. #40), Ex. 2 (Conner Dep.) at 65; Ex. 5 (Fredrickson Dep.) at 21, 22; Ex. 6 (Martin Dep.) at 48-49, 81-84; Ex. 7 (Van Ranst, Jr. Dep.) at 22-25, 26; Exs. 9 & 10 (Smallwood's performance reviews); Ex. 11 (Cartnick's performance

---

[23]  Liberty Mutual argues -- and there is evidence that tends to show -- that Smallwood was not qualified for the promotions she did not receive and that the men who received the positions were more qualified than she. See Mem. in Supp. of Def.'s Mot. for Summ. J. (Doc. #38) at 21-22; Def.'s Mot. for Summ. J. (Doc. #38), Ex. B (Connell Aff.) ¶¶ 8-10; Ex. C (Conner Dep.) at 74-75; Ex. D (Connell Dep.) at 25-27, 29-31. However, because Smallwood has produced admissible evidence that -- if credited -- would allow a jury to infer that she was qualified, I conclude that she has satisfied her burden at the first step of the McDonnell Douglas framework. The conflicting evidence adduced by the parties regarding Smallwood's qualifications demonstrates the existence of a genuine factual dispute that must be resolved by the jury.

review); Ex. 13 (Harding Dep.) at 46-49. Accordingly, Smallwood has done all that is required to establish a prima facie case.

Once the plaintiff has made a prima facie case, the burden shifts to the defendant, who can rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for its actions. See Hicks, 509 U.S. at 506-07; Burdine, 450 U.S. at 253, 254; McDonnell Douglas, 411 U.S. at 802. The defendant's burden is solely a matter of production; the burden of persuasion remains at all times with the plaintiff. See Hicks, 509 U.S. at 508; Burdine, 450 U.S. at 257-58, 260.

Liberty Mutual has clearly articulated a nondiscriminatory reason for not promoting Smallwood and has produced admissible evidence in support of its position. According to Liberty Mutual, the reason that Smallwood did not receive particular promotions -- including promotion into the positions filled by Ramkhelawan and Cartnick – was because she lacked the skills and/or qualifications required for those positions. See Mem. in Supp. of Def.'s Mot. for Summ. J. (Doc. #38) at 21-22.

-44-

Specifically, Liberty Mutual maintains that during the mid-1990s, it reorganized the commercial markets division of its information systems department in order to meet new business demands. This reorganization, the company contends, required the creation of new computer applications and new management positions. According to Liberty Mutual, these jobs, which included the positions filled by Ramkhelewan and Cartnick, called for skills and/or qualifications that Smallwood did not have. See Def.'s Mot. for Summ. J. (Doc. #38), Ex. B (Connell Aff.) ¶¶ 4-10, Attachments I & II; Ex. C (Conner Dep.) at 74-75; Ex. D (Connell Dep.) at 17-20, 25-27, 29-31, 37, 42-43, 56.

Because both of the parties have met their burdens at steps one and two of the McDonnell Douglas framework, the presumption of discrimination drops out of the case and I turn to the ultimate issue under this claim: whether Smallwood has presented sufficient evidence to prove that Liberty Mutual's nondiscriminatory reason was a pretext for sex-based

discrimination.[24]  See Hicks, 509 U.S. at 507-08, 510-11; Burdine, 450 U.S. at 253, 255, 256; McDonnell Douglas, 411 U.S. at 804-05.  Under the First Circuit's approach, sometimes referred to as a "pretext-plus" standard, a plaintiff must establish both that the defendant's explanation is pretextual and that the defendant was actually motivated by discriminatory animus.  See, e.g., Thomas v. Eastman Kodak Co., 183 F.3d 38, 56-57, 62 (1st Cir. 1999), cert. denied, --- S.Ct. ---, 2000 WL 36218 (Feb. 22, 2000); Mullin v. Raytheon Co., 164 F.3d 696, 699 (1st Cir.), cert. denied, 120 S.Ct. 44 (1999); Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998).  In certain

--------

[24]  The First Circuit has advised that "[a]t the summary judgment phase, 'courts should not unduly complicate matters . . . by applying legal rules that were devised to govern the basic allocation of burdens and order of proof.'  Instead, the focus should be on the ultimate issue: whether, viewing the 'aggregate package of proof offered by the plaintiff' and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the [employment practice at issue] was motivated by . . . discrimination." Dominguez-Cruz, --- F.3d ---, 2000 WL 97676, at *4 (quoting Mesnick v. General Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991)) (internal citation omitted); see also Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999); Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996).

circumstances, a plaintiff may prove both pretext and discrimination by the same evidence. See Dominguez-Cruz v. Suttle Caribe, Inc., --- F.3d ---, 2000 WL 97676, at *8 n.5 (1st Cir. Feb. 2, 2000); Thomas, 183 F.3d at 57, 62, 64; Dichner, 141 F.2d at 30. Furthermore, a plaintiff may carry her burden by means of indirect (i.e., circumstantial) evidence, and a reviewing court must consider all relevant evidence of pretext and discrimination in the aggregate. See Fernandes, 199 F.3d at 581; Thomas, 183 F.3d at 58; Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 335 (1st Cir. 1997). In other words, the appropriate inquiry is whether, based on the totality of the evidence, a reasonable jury could infer that the defendant's proffered explanation was pretextual and that the defendant was actually motivated by discriminatory animus. See Dominguez-Cruz, --- F.3d ---, 2000 WL 97676, at *4; Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 20 (1st Cir. 1999). As noted previously, the First Circuit has cautioned that courts making this inquiry into an employer's motivation should

be especially reluctant to grant summary judgment in the employer's favor. <u>See, e.g.</u>, <u>Domiguez-Cruz</u>, 2000 WL 97676, at *7 (citing <u>Hodgens</u>, 144 F.3d at 167; <u>Mulero-Rodriguez v. Ponte, Inc.</u>, 98 F.3d 670, 677 (1st Cir. 1996)); <u>DeNovellis v. Shalala</u>, 124 F.3d 298, 306 (1st Cir. 1997).

Two types of evidence support Smallwood's claim that Liberty Mutual's proffered reason is a pretext for discriminatory animus: (1) evidence that Conner, the head of the information systems department, commented that women were "intuitive" and "nurturing," and that aggressive women could be perceived as "bitches," <u>see</u> Pl.'s Obj. (Doc. #40), Ex. 1 (Smallwood Dep. 11/10/99) at 101-02, 105-06; Ex. 2 (Conner Dep.) at 65-66; and (2) statistical evidence of a marked disparity in the number of women and men in senior management positions within the information systems department, <u>see</u> <u>id.</u>, Ex. 8. Based on the First Circuit's precedents, I conclude that this evidence, considered in the aggregate, creates a genuine factual dispute on the issues of pretext and discrimination.

The First Circuit has repeatedly held that a decisionmaker's derogatory or discriminatory comments about a protected class of which the plaintiff is a member may allow a reasonable jury to infer pretext and/or discriminatory intent, especially when the comments are considered in combination with other probative evidence. See, e.g., Dominguez-Cruz, --- F.3d ---, 2000 WL 97676, at *7, 8 n.6; Fernades, 199 F.2d at 581, 589; Hodgens, 144 F.3d at 171 (citing cases); Kelley v. Airborne Freight Corp., 140 F.3d 335, 347 (1st Cir.), cert. denied, 119 S.Ct. 341 (1998); Mulero-Rodriguez, 98 F.3d at 675-77; Woodman v. Haemonetics Corp., 51 F.3d 1087, 1093, 1094 (1st Cir. 1995); Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 721 (1st Cir. 1994). In this case, the comments in question, which arguably express derogatory and/or stereotypical views of women, were made by a person with authority to approve promotion and hiring decisions in the information systems department. See Pl.'s Obj. (Doc. #40), Ex. 2 (Conner Dep.) at 71-72; Def.'s Mot. for Summ. J. (Doc. #38), Ex. B ¶ 1. The comments appear to have been made in August 1997, see

Pl.'s Obj. (Doc. #40), Ex. 1 (Smallwood Dep. 11/10/99) at 98-101, not long after the hiring of Cartnick, one of the employment actions that Smallwood claims was motivated by discriminatory animus. The First Circuit has treated such a temporal proximity -- or the lack thereof -- as an important factor in determining relevancy. See, e.g., Dominguez-Cruz, --- F.3d ---, 2000 WL 97676, *8 n.6 (citing McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals, 140 F.3d 288, 301 (1st Cir. 1998), cert. denied, 119 S.Ct. 870 (1999)); Bina v. Providence College, 39 F.3d 21, 26 (1st Cir. 1994); Kelley, 140 F.3d at 348; Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 97 (1st Cir. 1996). Because Conner had the authority to approve personnel decisions in the information systems department and made the comments in question within several months of the decision to hire Cartnick, the comments cannot be characterized as "stray remarks" irrelevant to pretext or discriminatory intent. See Dominguez-Cruz, --- F.3d ---, 2000 WL 97676, at *8 n.6; Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st

Cir. 1998) (citing Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 6 n.8 (1st Cir. 1998)); McMillan, 140 F.3d at 301; Ayala-Gerena, 95 F.3d at 97. Rather, they constitute circumstantial evidence from which a reasonable jury could infer that personnel decisions were made on the basis of sex, and therefore that Liberty Mutual's post hoc explanation for those decisions was pretextual.

Moreover, the evidence of Conner's comments must be considered in combination with the other evidence presented in this case. Smallwood contends that the disparity between the number of men and women who held senior management positions in the information systems department helps to show the existence of sex-based bias in the promotions process. See Pl.'s Obj. (Doc. #40) at 20-21. While the First Circuit has expressed ambivalence as to the probative value of statistical evidence in disparate treatment cases,[25] many of its opinions have concluded that such

_____

[25] For example, in McMillan, the court noted that "in a disparate treatment case . . . the necessary focus on the treatment of a particular individual appears incongruous with an analysis that necessarily involves numerous individuals." 140 F.3d at 303 (citing LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993); Cumpiano v. Banco Santander Puerto Rico, 902

-51-

evidence can be probative of pretext and/or discrimination.  See,

e.g., McMillan, 140 F.3d at 303; Speen v. Crown Clothing Corp.,

102 F.3d 625, 635 (1st Cir. 1996); Mesnick v. General Elec. Co.,

950 F.2d 816, 824 (1st Cir. 1991); Lamphere v. Brown Univ., 685

F.2d 743, 749-50 (1st Cir. 1982).  Both the Supreme Court and the

First Circuit have noted that statistical evidence "may be

helpful" in determining whether the employer's challenged

decision "conformed to a general pattern of discrimination."

McDonnell Douglas, 411 U.S. at 805; see also Freeman v. Package

Mach. Co., 865 F.2d 1331, 1342 (1st Cir. 1988) (same).[26]

_____

F.2d 148, 156 (1st Cir. 1990)).  "Nonetheless," the court stated,
"such analyses are admissible even in disparate treatment cases
unless they are 'so incomplete as to be inadmissible as
irrelevant.'"  Id. (quoting Bazemore v Friday, 478 U.S. 385, 400
n.10 (1986) (Brennan, J., concurring)).  The same ambivalence can
be seen in Bina v. Providence College, 39 F.3d 21 (1st Cir.
1994), in which the court stated "[t]his is a case where
statistical evidence 'might be suggestive or it might be
meaningless.'"  Id. at 27 (quoting Cumpiano, 902 F.2d at 156).

[26]  In McDonnell Douglas, a case in which the plaintiff
alleged, inter alia, disparate treatment based on race, the Court
stated that "[t]he District Court may, for example, determine,
after reasonable discovery that 'the (racial) composition of the
defendant's labor force is itself reflective of restrictive or
exclusionary practices.'"  411 U.S. at 805 n.19.  The Court

Because Smallwood has created a genuine factual issue concerning the actual motivation for Liberty Mutual's decisions, I deny Liberty Mutual's motion to grant summary judgment on the entirety of Smallwood's Title VII claim.  Rather, as explained above, I grant Liberty Mutual's motion only to the extent that Smallwood is precluded from establishing liability and obtaining recovery for time barred acts of discrimination.  Liberty Mutual's motion is denied with respect to the remainder of Smallwood's Title VII claim.

## B.  **Smallwood's Equal Pay Act Claim**

Liberty Mutual contends that Smallwood's Equal Pay Act claim is subject to a two-year statute of limitations because the record contains no evidence of a willful violation.  For the

---

cautioned, however, "that such general determinations, while helpful, may not be in and of themselves controlling as to an individual hiring decision, particularly in the presence of an otherwise justifiable reason for refusing to rehire." Id.  I conclude from this discussion that a reasonable jury could (but would not be required to) rely in part on a statistical disparity to draw an inference of pretext and/or discriminatory animus.

reasons set forth below, I disagree.[27]

## 1.   "Willfulness" and the Two-Tiered Limitations Period

Because the EPA is part of the Fair Labor Standards Act (FLSA), the same statute of limitations applies to both statutes. See McLaughlin v. Richland Shoe Co., 486 U.S. 128, 131 (1988); Legoff v. Trustees of Boston Univ., 23 F. Supp.2d 120, 125 (D. Mass. 1998).  Under the FLSA's two-tiered limitations provision, a civil enforcement action must be brought "within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."[28]  29 U.S.C. § 255(a) (1994).  The Supreme Court has defined a willful violation of the

---

[27]   Liberty Mutual's challenge to the sufficiency of Smallwood's EPA claim is limited to the related issues of the applicable limitations period and the scope of Smallwood's potential recovery.  Accordingly, I express no view on the underlying merits of the claim.

[28]   A claim of unequal compensation accrues each time the plaintiff receives an unequal paycheck for equal work.  See Pollis v. New Sch. for Social Research, 132 F.3d 115, 119 (2d Cir. 1997) (citing Bazemore v. Friday, 478 U.S. 385, 395-96 (1986) (Brennan, J., concurring) (under Title VII)); Legoff, 23 F. Supp.2d at 126.

-54-

FLSA as one in which "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Richland Shoe, 486 U.S. at 133; see also Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 679-80 & n.14 (1st Cir. 1998) (applying Richland Shoe standard); Reich v. Newspapers of New England, Inc., 44 F.3d 1060, 1079 (1st Cir. 1995) (same). Consequently, for the three-year limitations period to apply, Smallwood must show that Liberty Mutual either knew, or showed reckless disregard for whether its conduct was unlawful under the EPA.

The "reckless disregard" standard articulated in Richland Show places a substantial burden on a plaintiff seeking to demonstrate willfulness. "A finding of willfulness requires something more than merely showing that an employer knew about the [relevant statute] and its potential applicability to the workplace." Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 721 (1st Cir. 1994) (under ADEA). Further, a showing of mere negligence is not enough to demonstrate willfulness. See Hazen

<u>Paper Co. v. Biggins</u>, 507 U.S. 604, 615 (1993); <u>Richland Shoe</u>, 486 U.S. at 133.  Moreover, an employer's action will not be deemed willful "[i]f [the] employer acts unreasonably, but not recklessly, in determining its legal obligation."  <u>Richland Shoe</u>, 486 U.S. at 135 n.13.

Several courts have found sufficient evidence of willfulness when a plaintiff repeatedly complained to the defendant about a sex-based disparity in pay and the defendant did nothing to remedy the disparity or actively discouraged the plaintiff from seeking a remedy.  <u>See, e.g.</u>, <u>Pollis v. New Sch. for Social Research</u>, 132 F.3d 115, 119-20 (2d Cir. 1997) (plaintiff made multiple complaints over several years about sex based pay disparity but defendant failed to rectify the situation); <u>Legoff</u>, 23 F. Supp.2d. at 124-26 (plaintiff made repeated complaints about sex-based pay disparity; defendant not only failed to remedy disparity but also threatened to terminate plaintiff is she filed a formal complaint).

As noted previously, the record shows that Smallwood

repeatedly complained to her superiors about being undercompensated. See Def.'s Mot. for Summ. J. (Doc. #38), Ex. A (Smallwood Dep. 6/16/99) at 75-79, 150. When describing those instances in her deposition, Smallwood stated: "I specifically remember talking about not what the market is paying, but you're not -- I am not being compensated. You have people in the group, men in the group -- and I even recall certain people talking with George Kramer and Michael Jerauld about their compensation, their grade level, my responsibility, and that I should be of equal grade level, which I also should be equal pay . . . ." Id. at 77-78. Smallwood recounted a particular conversation with Richard Connell in January 1997, in which she said, "I want to be compensated equally and fairly." Id. at 78. Smallwood further attested that during various discussions with Liberty Mutual personnel she stated "I don't feel that I'm being paid fairly and equally." Id. at 150.

Construing this evidence in the light most favorable to Smallwood, a reasonable jury could infer that Smallwood's

repeated complaints of sex-related unequal compensation were sufficient to alert Liberty Mutual to the possibility that it was in violation of the EPA. Because this evidence creates a genuine factual issue regarding willfulness, it is sufficient to defeat Liberty Mutual's contention that the two-year limitations period necessarily applies to Smallwood's EPA claim.[29] Because Smallwood filed her original complaint in this action on June 3, 1998, her potential recovery under the EPA extends to back pay for any proven violations that accrued between June 3, 1995 and October 17, 1997, the date that she resigned her position at

---

[29] Because willfulness is a fact-intensive issue that requires a plaintiff to demonstrate that the defendant had the requisite state of mind, I am particularly reluctant to take the issue away from the jury at the summary judgment stage. See Reich v. Monfort, 144 F.3d 1329, 1334 (10th Cir. 1998) (stating that wilfullness determination under FLSA is a mixed question of law and fact in which "factual issues predominate"); Newspapers of New England, 44 F.3d at 1080 (noting that whether FLSA violation is willful is mixed question of law and fact); DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (cautioning that courts should exercise restraint in granting summary judgment for moving party when nonmoving party must prove motive or intent).

Liberty Mutual.[30]  See Pollis, 132 F.3d at 118-19 (holding that backpay cannot be recovered for disparities in compensation that occurred outside of limitations period); Gandy v. Sullivan County, Tennesee, 24 F.3d 861, 864-65 (6th Cir. 1994) (affirming that EPA plaintiff can collect damages for violations occurring within limitations period).

## IV.    CONCLUSION

For the foregoing reasons, Liberty Mutual's motion for summary judgment (Doc. #38) is granted to the extent that Smallwood is time barred from establishing liability or recovering for any violations of Title VII that accrued prior to January 23, 1997.  Liberty Mutual's motion is also granted to the extent that Smallwood has waived any claim for constructive discharge under Title VII and is therefore not entitled to recover any front pay under the Act.  As to the remainder of Smallwood's Title VII claim, Liberty Mutual's motion is denied.

_____

[30]  Smallwood is also precluded from duplicative recovery under her Title VII and EPA claims.  See Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 937 (1st Cir. 1995).

Liberty Mutual's motion is also denied to the extent that Smallwood is not precluded from seeking recovery for any violation of the Equal Pay Act that accrued between June 3, 1995 and October 17, 1997.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 6, 2000

cc:  Emily Rice, Esq.
     James Gambrill, Esq.